In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3470

United States of America,

Plaintiff-Appellee,

v.

Rodney White,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 525--Charles P. Kocoras, Judge.

Argued April 6, 2000--Decided July 25, 2000

Before Posner, Chief Judge, and Flaum and Ripple,
Circuit Judges.

Flaum, Circuit Judge.  Rodney White appeals his
conviction for bank robbery, aggravated bank
robbery, and kidnaping during a bank robbery, in
violation of 18 U.S.C. sec.sec. 2113(a), (d), and
(e), as well as for using and carrying a firearm
in relation to a crime of violence in violation
of 18 U.S.C. sec. 924(c)(1)(A). For the reasons
stated herein, we affirm.

I.   BACKGROUND

On July 18, 1998, Rodney White walked into a
St. Paul Federal Bank on the west side of Chicago
wearing a baseball cap and dark glasses. White
waited in a teller line behind several customers,
and when it was his turn, he jumped over the
counter and placed a green box wrapped in black
electrical tape with wires sticking out of it
next to the teller. He then pulled out a gun and
pointed it at Elvia Barrera, the teller who had
attempted to assist him. White told Ms. Barrera
that the box was a bomb and ordered her to put
all of the money from her teller drawer into a
bag. When Ms. Barrera complied, White turned to
Maria Torres, the teller standing on the other
side of him, and ordered her to do the same. The
two tellers placed a total of $9,750 in the bag.
White then forced Ms. Torres over the teller
counter and followed her into the lobby of the

bank. He grabbed her from behind and walked toward the front entrance of the bank, holding her in front of him and keeping the gun to her head.

At the time of the robbery, two off-duty police officers, Michael Hallinan and Jim Laufer, were working as security guards for the bank. The officers drew their guns and approached White while he was using Ms. Torres as a human shield to escape from the bank. The officers ordered White to drop his gun and release Ms. Torres. White ignored their commands and instead pointed his gun at the officers and dragged Ms. Torres out of the bank. The entire robbery was captured by six video cameras placed throughout the lobby of the bank.

White took Ms. Torres to a red Dodge Omni that was parked in front of the bank and forced her into the back seat of the car. The officers followed White out of the bank, and White again pointed his gun at them. Officer Hallinan fired his gun several times at White but missed. White then jumped into the car and began to drive away. Officer Hallinan continued to fire at the car and managed to hit the rear tire and rear passenger door. White drove away from the scene and at one point went the wrong way down a one-way street. He eventually let Ms. Torres out of the car.

Meanwhile, back at the bank, the police discovered that the box left on the counter in front of Ms. Barrera was nothing more than a Victoria's Secret box with a baby doll inside. Ms. Torres, Ms. Barrera, Officer Hallinan, Officer Laufer, and at least two other persons present at the bank during the robbery identified White's picture from a photo array as that of the bank robber.

Several hours later, White went to the house of his landlord J.M. Jackson and asked Mr. Jackson if he could park a car in his garage. The next day, Mr. Jackson found a red Dodge Omni that had bullet holes in the right rear tire and rear passenger door in his garage. He called the police, who discovered White's fingerprints on the car and confirmed that the bullet holes were made by bullets from Officer Hallinan's gun.

After leaving Mr. Jackson's house, White learned that the police were searching for him in connection with the bank robbery. He spent the next nine days staying with a friend or at an EconoLodge. During those nine days, White made notes concerning his defense against charges that he committed the bank robbery. Throughout this time, local news stations were running stories about the robbery, claiming that White was the

main suspect.

On July 24, 1998, the FBI received an anonymous tip informing them of the whereabouts of White. The tip was later discovered to be from Adrian Garner, an acquaintance of White.

A jury found White guilty of bank robbery, aggravated bank robbery, kidnaping during a bank robbery, and use of a weapon during a crime of violence. The trial judge sentenced White to 354 months in prison, and he now appeals.

## II. DISCUSSION
## A. Prior Conviction

White first argues that his trial was rendered fundamentally unfair by the prosecutor's misconduct in impeaching White's testimony using the factual details underlying his prior conviction for aggravated criminal sexual abuse. White also argues that his trial was further prejudiced by the government's reference during closing argument to the alleged facts supporting this conviction. Because White did not object to either of these instances of misconduct at trial, we review his claims for plain error. See United States v. Robinson, 8 F.3d 398, 412 (7th Cir. 1993). In order to find plain error we must determine: 1) that an error was made; 2) that the error was clear or obvious; and 3) that the defendant's substantial rights were affected by that error. See United States v. Olano, 507 U.S. 725, 732-35 (1993). Where we find plain error, we may use our discretion to remedy only "those errors that 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" United States v. Young, 470 U.S. 1, 15 (1985) (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)).

At a pre-trial proceeding, the district court granted the government's motion requesting that it be allowed to impeach White with his prior conviction for sexual abuse. The government was permitted to use the fact of that conviction only and was not allowed to examine the defendant on the circumstances surrounding the conviction. However, on direct examination, White not only admitted to the fact of the conviction but expounded on his version of the circumstances underlying that conviction in violation of the district court's order by telling the jury that he was prosecuted for having consensual sex with a girl under the age of seventeen when he was twenty. On cross-examination, the government impeached this testimony using the facts recounted in a police report of the crime./1 In addition, during closing argument the government again referenced these facts from the police

report by stating that "the defendant raped a 13 year old girl and sent her to the hospital, and he lied about that." White contends that his trial was rendered fundamentally unfair by the government's misconduct in revealing these allegations underlying his prior conviction to the jury.

To evaluate a claim of prosecutorial misconduct, we engage in a two-step analysis. First, we examine the challenged remarks in isolation to determine whether they were improper. If so, we then examine the remarks in light of the entire record to determine whether they could have so prejudiced the jury that the defendant can not be said to have received a fair trial. See United States v. Butler, 71 F.3d 243, 254 (7th Cir. 1995); United States v. Swiatek, 819 F.2d 721, 730 (7th Cir. 1987).

Under Federal Rule of Evidence 609, it was proper for the government to impeach White with evidence of his prior conviction for sexual assault. See Robinson, 8 F.3d at 409. It was also permissible for White to testify to the fact of his conviction on direct examination as a matter of trial strategy in order to lessen the impact of the information on the jury. See id. Ordinarily, "the details of the prior conviction should not [be] exposed to the jury." Id.; see also Campbell v. Greer, 831 F.2d 700, 707 (7th Cir. 1987) (holding that it is error to admit more than the name of the crime charged, the date, and the disposition of a prior conviction for impeachment purposes). However, where a defendant attempts to explain away the prior conviction during direct examination by giving his own version of events, he has "opened the door" to impeachment by the prosecution on the details of the conviction. See Robinson, 8 F.3d at 410; United States v. Kimberlin, 805 F.2d 210, 234 (7th Cir. 1986); United States v. Fountain, 768 F.2d 790, 795 (7th Cir. 1985). Nevertheless, the prosecution's response must be tailored to the statements made by the defendant. The open door does not give the prosecution license to dwell on the details of the prior conviction and shift the focus of the current trial to the defendant's prior bad acts. See Robinson, 8 F.3d at 410. Most importantly for this case, the prosecution is limited to using only the information for which it has a good faith belief that there is supporting evidence. See United States v. Harris, 542 F.2d 1283, 1307 (7th Cir. 1976) ("It is improper conduct for the Government to ask a question which implies a factual predicate which the examiner knows he cannot support by evidence."); see also Robinson, 8 F.3d at 413; United States v. Elizondo, 920 F.2d 1308, 1313 (7th Cir. 1990).

In this case, after the defendant opened the door to the government's impeachment using the details of his prior conviction for sexual assault, the prosecutor used facts from a police report describing that crime as the violent forcible rape of a young girl. The government chose to present this view of the crime in spite of the fact that there was significant evidence that the sex was consensual as well as the fact that the defendant received no jail time for what the prosecution represented as a brutal crime. We have rejected the contention that the mere existence of a factual dispute surrounding the circumstances of a prior conviction justifies the government's use of impeachment evidence that has no factual basis. See Elizondo, 920 F.2d at 1314. We question the prosecutor's judgment here in presenting White's prior conviction in a light that does not appear to be supported by the facts surrounding that conviction. However, the police report does provide some basis for the prosecutor's line of questioning, and, while we are concerned with the prosecutor's judgment, we do not find that these actions rise to the level of misconduct.

The government's statement in its closing argument that the defendant raped a 13 year old girl and sent her to the hospital is a different situation. Because the defendant denied these allegations and the police report was not in evidence, there is no evidence in the record to support the government's assertion. Argument referencing facts not in evidence is clearly improper, and we conclude that the prosecutor engaged in misconduct in making the challenged statement. See United States v. Gonzalez, 933 F.2d 417, 430 (7th Cir. 1991).

Having determined that the government's conduct was improper, we now examine the record as a whole to decide whether White was prejudiced by the prosecutor's misconduct. Our inquiry into the prejudice created by prosecutorial misconduct is informed by several factors, including: "(1) the nature and seriousness of the prosecutorial misconduct, (2) whether the prosecutors' statements were invited by impermissible conduct by defense counsel, (3) whether the trial court instructed the jury to disregard the statements, (4) whether the defense was able to counter the improper arguments through rebuttal, and (5) the weight of the evidence against the defendant." United States v. Pirovolos, 844 F.2d 415, 426 (7th Cir. 1988) (reciting the factors outlined in Darden v. Wainwright, 477 U.S. 168, 181-83 (1986)); see also Butler, 71 F.3d at 254; United States v. Badger, 983 F.2d 1143, 1450 (7th Cir. 1993).

In this case, the improper remark made by the government is serious and the trial court issued no instructions to the jury to disregard the prosecutor's statement. However, White invited commentary on the details of his prior conviction by recounting his own version of events on direct examination. In addition, defense counsel refuted the prosecution's improper remark in its own closing argument and the prosecution did not reference that statement again in its rebuttal. Finally, and most importantly, the overwhelming evidence of White's guilt "eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations or exploited the Government's prestige in the eyes of the jury." Young, 470 U.S. at 19. Considering all of these factors, and our review under the plain error standard, we conclude that the government's improper remark did not render White's trial fundamentally unfair.

We wish to emphasize, however, that inappropriate conduct by defense counsel or witnesses is not an invitation for the government to act improperly in response. The appropriate course of action is for the government to object and for the trial judge to strike the improper comments, instructing the jury to disregard them. See Young, 470 U.S. at 13 (admonishing that in response to defense counsel's inappropriate argument "the prosecutor at the close of defense summation should have objected to the defense counsel's improper statements with a request that the court give a timely warning and curative instruction to the jury"). In this case, the most advisable course of action might have been for the government to avoid all temptation for any party to act improperly by offering to enter the evidence of the prior conviction through stipulation. We underscore that the government has a special responsibility to ensure the integrity of the criminal judicial process by "liv[ing] up to the code of professional ethics and fair play at all times." Gonzalez, 933 F.2d at 433.

B.  Evidentiary Rulings

White next challenges two of the district court's evidentiary rulings. White argues that the district court erred when it refused to allow him to introduce evidence that Adrian Garner was the anonymous tipster who informed the FBI of his whereabouts after the robbery and that the court erred when it did not allow him to introduce into evidence video tapes of the news coverage of the robbery. We consider each of these claims in turn, reviewing the district court's evidentiary rulings for abuse of discretion. See United

States v. Van Dreel, 155 F.3d 902, 905 (7th Cir. 1998).


   a.  Anonymous Tip

     White's theory of defense was that Adrian Garner committed the robbery and framed him. In support of this theory, White wanted to show that it was Garner who called the police to turn him in after the robbery and that Garner lied about who he was when he gave the police this tip. White attempted to elicit this information on cross-examination of FBI Agent Steinbach, whom the government had called as a rebuttal witness to impeach White's testimony. The district court excluded this evidence as irrelevant, and White argues that this ruling was in error.

     A district court has considerable leeway in making evidentiary determinations and we will overturn that court's considered judgment only where "no reasonable person could agree with the district court's ruling." United States v. Adames, 56 F.3d 737, 746 (7th Cir. 1995). In this case, the district court found that the manner in which the FBI located White was not relevant to any issue in the trial. While the information that it was Mr. Garner who turned in White might have been minimally relevant to White's theory of defense, any error the district court may have made in excluding this evidence on pure relevancy grounds is harmless. The district court could have properly excluded this evidence under Rule 403 because its slight probative value is clearly outweighed by the time that would have been wasted on its presentation and its possible confusing effect on the jury. Furthermore, defense counsel attempted to elicit this information through cross-examination of the government's rebuttal witness, whose sole testimony on direct related to prior inconsistent statements made by the defendant. Thus, the district court could have excluded the line of cross-examination on the alternate ground that it exceeded the scope of the direct examination. See Fed. R. Evid. 611(b); United States v. Hayward, 6 F.3d 1241, 1255-56 (7th Cir. 1993) (holding that the defendant was restricted on cross-examination of the prosecution's witness, who had been recalled for a second time, to the scope of the government's questioning on the second direct examination). We, therefore, conclude that the district court did not abuse its discretion when it refused to allow White's cross-examination of a government witness on the identity of the person who turned him in.


   b.  Video Tapes

White next argues that the district court erred in refusing to allow him to play video tapes of news reports that were aired during the nine days he was hiding out after the robbery. White asserts that he wanted to present the video tapes to show his state of mind when he was making notes concerning his defense strategy to a prosecution for the robbery. He also claimed that the news reports were the source of his information about the details of the robbery that were reflected in those notes. The district court excluded the tapes under Federal Rule of Evidence 403, finding that the numerous factual inaccuracies concerning the details of the robbery would be confusing to the jury and that the tapes lacked significant probative value because the government did not contest the fact that news reports about the robbery were aired while White was hiding out.

This ruling by the district court is clearly reasonable, especially in light of the fact that the government did not contest White's testimony concerning the substance of the news reports and his reaction to them. Therefore, we conclude that the district court did not abuse its discretion in excluding the video tapes under Rule 403.

C.  Sentencing Enhancements

White finally contests his sentence, arguing that the district court erred by imposing an enhancement under U.S.S.G. sec. 2B3.1(b)(2)(E) for use of a bomb in commission of a robbery and by enhancing his sentence under U.S.S.G. sec. 3C1.2 for endangering others during the commission of the offense. Because White is challenging the legal interpretation of the Sentencing Guidelines ("Guidelines") and relevant statutes, our review is de novo. See United States v. Nobles, 69 F.3d 172, 190 (7th Cir. 1995). We consider each of White's arguments in turn.

a.  Use of Explosive Device

White argues that the district court erred when it imposed a five-year consecutive sentence under 18 U.S.C. sec. 924(c) for his use of a gun during the robbery and an enhancement under U.S.S.G. sec. 2B3.1(b)(2)(E) for his use of a fake bomb during the same robbery. White asserts that it is impermissible double counting to impose both the statutory sentence increase and the Guidelines' sentencing enhancement for the use of two different weapons in the commission of the same underlying offense.

When a person commits either a drug trafficking crime or a crime of violence and uses, carries, or possesses a "firearm"/2 in relation to that crime, his sentence may be enhanced to account for the added danger posed by the presence of the firearm in one of two ways. If he is convicted solely of the underlying offense, the sentencing judge may enhance his sentence under the Guidelines. See, e.g., U.S.S.G. sec.sec. 2B3.1(b), 2D1.1(b)(1). Alternatively, the government may choose to bring a separate charge under 18 U.S.C. sec. 924(c), and, if convicted, the defendant will receive the penalty mandated by that statute. See U.S.S.G. sec. 2K2.4(a)./3 If a defendant is convicted and sentenced under 18 U.S.C. sec. 924(c), the sentencing judge is prohibited from enhancing his sentence under the Guidelines for the same weapon and the same conduct that underlie the sec. 924(c) conviction. See U.S.S.G. sec. 2K2.4 Application Note 2;/4 United States v. Mrazek, 998 F.2d 453, 454 (7th Cir. 1993) ("A conviction under sec. 924(c) precludes the enhancement the Guidelines otherwise would provide.").

However, a defendant may receive both the sec. 924(c) statutory sentence and a Guidelines enhancement if the enhancement and the statutory sentence are imposed for different underlying conduct. For example, where a defendant is sentenced under sec. 924(c) for use of a gun in committing a crime, he may have his sentence enhanced under the Guidelines for a co-defendant's use of a different gun in committing the same crime. See United States v. Washington, 44 F.3d 1271, 1281 (5th Cir. 1995); United States v. Kimmons, 965 F.2d 1001, 1011 (11th Cir. 1992) ("[T]he district court's application of [the Guidelines' enhancement] to each appellant did not 'double count' because it involved neither the same firearm nor the same possession for which a penalty was imposed under 18 U.S.C. sec. 924(c)."), rev'd on other grounds sub nom. Small v. United States, 508 U.S. 902 (1993), and reinstated in relevant part by United States v. Rodriguez, 65 F.3d 932, 933 (11th Cir. 1995). Similarly, where a defendant uses the same gun, or different guns, in the commission of two different crimes, he may receive a sec. 924(c) penalty for one of the underlying crimes and a Guidelines enhancement for the other. See Mrazek, 998 F.2d at 455; see also United States v. McCarthy, 77 F.3d 522, 537 (1st Cir. 1996); United States v. Blake, 59 F.3d 138, 139-40 (10th Cir. 1995).

However, we have determined that it was Congress's intent that the penalty imposed under sec. 924(c) account for all of the guns used in a single underlying offense. See United States v.

Cappas, 29 F.3d 1187, 1189 (7th Cir. 1994); see also United States v. Taylor, 13 F.3d 986, 994 (6th Cir. 1994) ("sec. 924(c)'s unit of prosecution is the underlying offense, not the number of firearms"). Therefore, imposing multiple sec. 924(c) penalties for the use of more than one gun in a single underlying offense is not permitted because sentencing in this fashion would violate the Double Jeopardy Clause. See Cappas, 29 F.3d at 1189 ("[U]se of multiple guns in a single drug conspiracy will not support multiple convictions under sec. 924(c)."); see also United States v. Willett, 90 F.3d 404, 408 (9th Cir. 1996); United States v. Chalan, 812 F.2d 1302, 1317 (10th Cir. 1987). Cf. Albernaz v. United States, 450 U.S. 333, 344 (1981) ("[T]he question of what punishments are constitutionally permissible [under the Double Jeopardy Clause] is not different from the question of what punishments the Legislative Branch intended to be imposed.").

Similarly, the Sentencing Commission has clearly stated that once a sentence under sec. 924(c) has been imposed, a sentencing court cannot add a Guidelines enhancement for conduct that has already been punished by the sec. 924(c) penalty. See U.S.S.G. sec. 2K2.4 Application Note 2 and Background Commentary./5 Therefore, because a sec. 924(c) penalty accounts for all of the guns possessed, carried, or used by the defendant in relation to an underlying offense, a Guidelines enhancement cannot also be imposed for use of more than one gun in the same underlying offense. See United States v. Knobloch, 131 F.3d 366, 372 (3d Cir. 1997) (holding that a defendant cannot receive a sec. 924(c) penalty for one gun and a Guidelines enhancement for a different gun used in the commission of the same underlying offense); United States v. Duran, 4 F.3d 800, 804 (9th Cir. 1993) (holding that where a defendant is sentenced under sec. 924(c), an enhancement under sec. 2B3.1(b)(2)(F) cannot be imposed for an express threat of death during the commission of the same crime); United States v. Smith, 981 F.2d 887, 893 (6th Cir. 1992) (same). But see Willett, 90 F.3d at 408 (holding that a defendant may be sentenced under sec. 924(c) for possession of a gun and under sec. 2D1.1(b)(1) for his possession of a knife and silencer in the same underlying drug trafficking offense). However, the question presented in this case is whether a sentencing court can impose a sec. 924(c) penalty in combination with a Guidelines enhancement for the defendant's use of a gun and a bomb, as opposed to the use of two guns, in the same underlying offense. We conclude that it can.

White was convicted under sec. 924(c) for using and carrying a gun in connection with the violent

crime of bank robbery. The district court imposed the mandatory five year consecutive sentence to account for this conviction. The district court further found that White used a bomb in connection with the same bank robbery and enhanced his sentence under sec.2B3.1(b)(2)(E) for this aspect of his criminal conduct./6 White argues that because his conduct in using the bomb was already accounted for in the imposition of the mandatory minimum sentence under sec. 924(c), the district court could not also enhance his sentence under the Guidelines for the use of a bomb in the same underlying offense./7

As discussed above, White is correct that the Guidelines prohibit a sentencing court from imposing a Guidelines enhancement for conduct that has already been punished by sentencing the defendant under sec. 924(c). However, we disagree with White that his conduct in using a bomb during the robbery was punished by the district court's imposition of a five-year consecutive sentence under sec. 924(c). As the Supreme Court has recently held, 18 U.S.C. sec. 924(c)(1)(A), prohibiting the use of a gun to commit a crime, and sec. 924(c)(1)(B)(ii),/8 prohibiting the use of a bomb to commit a crime, are separate offenses, not differing penalties for the same criminal conduct of using a "firearm" to commit a crime. See Castillo v. United States, 120 S.Ct. 2090, 2091, 2096 (2000). White was convicted under the former section, not the latter, and there is a "substantive and substantial" difference in the conduct punished by the two sections, id. at 2094. As the Supreme Court has stated, "the difference between carrying, say, a pistol and carrying a machinegun (or, to mention another factor in the same statutory sentence, a 'destructive device,' i.e., a bomb) is great, both in degree and kind. And, more importantly, that difference concerns the nature of the element lying closest to the heart of [sec. 924(c)]." Id. Congress intended to punish the use of a bomb to commit a crime by a minimum sentence of thirty years. See sec. 924(c)(1)(B)(ii). Therefore, the district court's imposition of a five-year sentence for White's use of a gun does not adequately account for his conduct of using a bomb. Because White was not punished for the use of the bomb to the extent Congress intended, the district court was free to impose a sentence under the Guidelines to account for that conduct. See United States v. Mancillas, 183 F.3d 682, 710 (7th Cir. 1999); United States v. Haines, 32 F.3d 290, 293 (7th Cir. 1994) (stating that impermissible "double counting" occurs only "when identical conduct is described in two different ways so that two different adjustments apply"). We, therefore, conclude that the district court did not err when it enhanced White's sentence

under U.S.S.G. sec.2B3.1(b)(2)(E) for his use of a bomb along with imposing the five-year mandatory minimum sentence required by his conviction under 18 U.S.C. sec. 924(c)(1)(A) for his use of a gun in relation to the same underlying offense.

b.  Endangering Others

White finally argues that the district court erred when it enhanced his sentence under multiple Guideline sections for his conduct during his escape from the bank. White asserts that the district court engaged in impermissible double counting because it enhanced his sentence under different sections for the same conduct.

"[D]ouble counting occurs when the court assesses more than one enhancement to the offense level for a single offense based on the same underlying conduct." Mancillas, 183 F.3d at 710. In this case, the district court enhanced White's sentence under sec. 2B3.1(b)(4)/9 for his conduct in taking Ms. Torres hostage during his escape from the bank. White's sentence was also enhanced under sec. 3A1.2(b)/10 for assaulting Officer Hallinan by pointing his gun at the officer several times during the escape. In addition, the district court applied a sec. 3C1.2/11 enhancement to White's sentence because, during White's flight from the bank, he endangered others by causing Officer Hallinan to fire on him as well as by driving the wrong way down a one-way street. White contests the addition of the enhancement under sec. 3C1.2, claiming that this enhancement penalizes him for conduct that has already been punished by the enhancement of his sentence under the two other guidelines. White further argues that his driving was insufficiently reckless to pose a substantial danger to others as required to impose an enhancement under sec. 3C1.2.

The district court imposed the three enhancements for three different aspects of White's conduct during his flight from the bank. Because "[e]ach enhancement responded to a separate aspect of his conduct," the cumulative adjustment of White's sentence under the different guidelines was appropriate. See United States v. Swoape, 31 F.3d 482, 483 (7th Cir. 1994) (holding that it was appropriate to enhance the defendant's sentence under several different guidelines for his conduct in engaging in a shoot-out with police followed by his reckless driving during flight from a bank robbery). In addition, the district court's finding that White's driving posed a substantial risk of serious bodily injury or death to another person

is not clearly erroneous. See United States v. Chandler, 12 F.3d 1427, 1433 (7th Cir. 1994) (reviewing for clear error a district court's factual findings that a defendant's conduct endangered others in such that a sec. 3C1.2 sentencing enhancement was appropriate). We therefore conclude that the district court did not err when it enhanced White's sentence under U.S.S.G. sec.sec. 2B3.1(b)(4), 3A1.2(b), and 3C1.2.

III.  CONCLUSION

        For the foregoing reasons, White's conviction and sentence are Affirmed.

/1 The line of questioning was as follows:

Q: Now this girl that you talked about, you said how old was she?
A: Approximately 14.
Q: Yes. Her birth date, did you learn during the course of that suit, sir, was February 10, 1978?
A  13 year old girl.
A: Uh-huh.

* * *

Q: You went to her house and you raped her?
A: No, that is not correct.

* * *

Q: You had sexual intercourse with her against her will as she was crying; isn't that correct?
A: No, it's not.
* * *

Q: She was treated at West Suburban Hospital; isn't that correct?
A: I wouldn't know that.

* * *

/2 "Firearm" is defined in 18 U.S.C. sec. 921(3) as:

"(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device."
The identical definition of a "firearm" is used for purposes of U.S.S.G. sec. 2B3.1. See U.S.S.G. sec. 2B3.1 Application Note 1 and sec. 1B1.1(e).

/3 U.S.S.G. sec. 2K2.4(a) provides:

If the defendant, whether or not convicted of another crime, was convicted under 18 U.S.C. . . .

. sec. 924(c) . . . the term of imprisonment is that required by statute.

/4 U.S.S.G. sec. 2K2.4 Application Note 2 provides:

Where a sentence under this section is imposed in conjunction with a sentence for an underlying offense, any specific offense characteristic for the possession, use, or discharge of an explosive or firearm (e.g. sec. 2B3.1(b)(2)(A)-(F) (Robbery)) is not to be applied in respect to the guideline for the underlying offense.

/5 The Background Commentary to U.S.S.G. sec. 2K2.4 states in relevant part:

18 U.S.C. sec.sec. 844(h), 924(c), and 929(a) provide mandatory minimum penalties for the conduct proscribed. To avoid double counting, when a sentence under this section is imposed in conjunction with a sentence for an underlying offense, any specific offense characteristic for explosive or firearm discharge, use, or possession is not applied in respect to such underlying offense.

/6 U.S.S.G. sec. 2B3.1(b)(2)(E) provides "if a dangerous weapon was brandished, displayed, or possessed, increase by 3 levels." Section 1.B1.1 Application Note 1(d) defines "dangerous weapon" as "an instrument capable of inflicting death or serious bodily injury." The fact that White used a fake bomb during his commission of the robbery is irrelevant for imposition of this enhancement because Application Note 1(d) further provides that "[w]here an object that appeared to be a dangerous weapon was brandished, displayed, or possessed, treat the object as a dangerous weapon."

/7 We note that White's bomb was fake, and, although fake bombs are treated as real ones in the sentencing Guidelines, fake bombs do not subject one to punishment under sec. 924(c). See 18 U.S.C. sec. 921(a)(4) ("The term 'destructive device' shall not include any device which is neither designed nor redesigned for use as a weapon."); see also United States v. Brewer, 36 F.3d 266, 270 (2d Cir. 1994) (holding that possession of a fake or toy gun does not violate sec. 924(c)); United States v. Kirvan, 997 F.2d 963, 966 (1st Cir. 1993); United States v. Westerdahl, 945 F.2d 1083, 1087 (9th Cir. 1991). Therefore, White's conviction under sec. 924(c) for his use of a real gun does not account for his additional use of a fake bomb, for which he cannot be punished under that statute.

However, we do not base our conclusion on the

distinction between fake and real firearms. Resting our decision solely on that distinction would lead to the perverse result that a defendant who uses a real gun and a fake gun in the commission of the same offense is eligible to receive a higher sentence than a defendant who used two real guns to commit the same crime. This is because the former defendant could receive both a statutory sentence under sec. 924(c) for the real gun and a Guidelines enhancement for the fake gun, while the latter defendant, whose conduct presents a greater risk of harm, could only receive either the statutory sentence or the Guidelines enhancement, but not both. We do not interpret the Guidelines to produce this result which is clearly contrary to their policy and purpose. See U.S.S.G. Ch. 1 Pt. A.3 (noting that one of the major policy goals of the Guidelines is to create "a system that imposes appropriately different sentences for criminal conduct of differing severity"); United States v. Dawn, 129 F.3d 878, 884 (7th Cir. 1997) (noting that the Guidelines operate to punish more culpable conduct more severely). Therefore, we will treat fake guns and bombs as indistinguishable from real ones for purposes of this discussion.

/8 18 U.S.C. sec. 924(B)(ii) provides that if the firearm "is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, the person shall be sentenced to a term of imprisonment of not less than 30 years." 18 U.S.C. sec. 921(a)(4) defines a destructive device as "(A) any explosive, incendiary, or poison gas--(i) bomb, (ii) grenade, (iii) rocket having a propellant charge of more than four ounces . . . ."

/9 U.S.S.G. sec. 2B3.1(b)(4) provides: "(A) if any person was abducted to facilitate commission of the offense or to facilitate escape, increase by 4 levels. . . ."

/10 U.S.S.G. sec. 3A1.2 provides: "If--(b) during the course of the offense or immediate flight therefrom, the defendant . . ., knowing or having reasonable cause to believe that a person was a law enforcement or corrections officer, assaulted such officer in a manner creating a substantial risk of serious bodily injury, increase by 3 levels."

/11 U.S.S.G. sec. 3C1.2 provides: "If the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, increase by 2 levels."