# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-2566

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

EDWARD M. DOUGLAS,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 02 CR 20040—**Michael P. McCuskey**, *Chief Judge.*

———————

ARGUED JANUARY 6, 2005—DECIDED MAY 25, 2005

———————

Before MANION, WOOD, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Edward Douglas was monitored selling a quantity of drugs to a cooperating government informant. A jury convicted him of distributing cocaine base (crack) in violation of 21 U.S.C. § 841(a)(1). The district court determined that Douglas was a career offender and imposed the sentence of mandatory life in prison. On appeal Douglas challenges two evidentiary rulings and his sentence. We affirm.

## I.

Douglas's conviction stems from his sale, on two occasions, of crack to Carl Williams, a government informant. Following his arrest on a state drug charge in July 2000, Williams served as an informant for the Kankakee Area Metropolitan Enforcement Group ("KAMEG"), a multi-jurisdictional drug task force in Kankakee County, Illinois. In return for sentencing consideration, Williams agreed to cooperate with KAMEG.

Williams informed KAMEG agents that he could purchase crack from Douglas, and the agents monitored a series of telephone conversations between Williams and Douglas. During these conversations, Williams and Douglas discussed the price for different amounts of crack and finally agreed to the sale of an ounce. These telephone conversations were recorded.

The date arranged for the first sale was April 30, 2001. Immediately prior to the sale, two KAMEG agents, Scott Monferdini and Bill Backus, met with Williams and fitted him with a "wire" so that they could monitor his conversation with Douglas. Before sending Williams to the sale, the agents also thoroughly searched him and his car and found no drugs or money. The agents then provided Williams with $750 to purchase the crack.

Williams drove to the sale location, a restaurant parking lot, followed by the two agents, who maintained constant visual surveillance of him. The agents also observed the entire transaction. The agents observed Williams and Douglas briefly sitting in Douglas's car and before Williams got out and retrieved a Tylenol bottle from the trunk. The entire sale was recorded on video.

After the sale, the agents followed Williams to a pre-arranged meeting place where Williams handed the agents the

bottle which contained 27.8 grams of crack. The agents again searched Williams and his car and found no drugs or money.

The second sale took place in much the same fashion. Williams called Douglas to arrange a sale of four and one-half ounces of crack. Monferdini and Backus again searched Williams and his car prior to the sale for drugs and money. Williams was again outfitted with a wire. The sale took place in the same parking lot on May 18, 2001. Williams was followed to the sale location and the entire sale was recorded on video. The serial numbers on the cash ($2,750) used for the sale were recorded.

After the sale was completed, Williams was followed by Backus to a prearranged location. Williams turned over two cans containing 113.8 grams of crack. Backus again searched Williams and his car and found no money or drugs.

At the same time, other KAMEG agents continued to watch Douglas as he left the restaurant and drove to a nearby store. When Backus's meeting with Williams was completed, the agents arrested Douglas. The $2,750 used for the sale was found in Douglas's possession.

Douglas was questioned about the sale and, when confronted with the audio and video recordings of the sale, admitted to selling crack to Williams. Douglas told the agents he obtained the crack from two people and that the drugs had been packaged in the Tylenol bottle and cans when he received the drugs from these sources. Douglas also told the agents that he, too, would like to cooperate with the agents in return for consideration of his charges.

Douglas apparently later decided against cooperating with the government and in May 2003, a federal grand jury returned a two-count indictment charging him with distributing crack in violation of 21 U.S.C. § 841(a)(1). The first

count charged Douglas with distributing more than five grams of crack, and the second count charged him with distributing more than 50 grams of crack.

In January 2003, more than a month before trial, the United States informed the district court and defense counsel that it did not intend to call Williams as a witness at trial. In response, Douglas's counsel informed the court and the government that he intended to call Williams as a witness. Concerned that Douglas sought to call Williams for improper reasons, the government filed a motion *in limine* and requested a hearing to determine the contours and relevancy of Williams's testimony.

At the hearing, Williams testified as to his recollection of the drug sales, as well as his own criminal history. Specifically, in 1994, Williams had been arrested on drug charges along with Douglas's grandfather. After his arrest, Williams was released on bond and fled to avoid prosecution. He spent the next six years as a fugitive. During this time (and apparently at the time of his 1994 arrest, as well) Williams used a series of aliases supported by false driver's licenses and identification cards he had obtained from someone in the Illinois Secretary of State's Office.

Williams was arrested on a warrant in 2000. Following his arrest he began to cooperate with KAMEG in hopes of sentencing consideration for the 1994 charges. As a result of the arrest of Douglas, Williams's charges were reduced and he was sentenced to a conditional discharge. He served only a few days in jail. At the time of the hearing, Williams was in jail, however, for another reason—he had been indicted for bank fraud in the Northern District of Illinois.

Douglas argued that he should be able to call Williams to the stand and impeach his credibility with his criminal history. The district court disagreed and granted the gov-

ernment's motion *in limine*. The district court ruled that Williams's credibility was not at issue and that, therefore, his criminal history was irrelevant. The court also held, however, that Douglas could call Williams as a transactional witness and could impeach his credibility with prior inconsistent statements concerning the circumstances of the sales.

The case then proceeded to trial. The government's case consisted of the testimony of Monferdini and Backus supported by, among other evidence, audio recordings of calls between Williams and Douglas and the sale, video recordings of the sale, the $2,750 recovered from Douglas on his arrest, and the drugs Williams turned over to Monferdini and Backus.

Douglas called two witnesses, Williams and Douglas's girlfriend, and also took the stand in his own defense. On direct examination, Douglas testified that he did, in fact, meet with Williams on April 30 and May 18, and that he took money from Williams. Douglas insisted, however, that he did not deliver drugs to Williams on those dates. Instead, Douglas claimed he took money from Williams for a promise to later supply Williams with drugs—a promise Douglas did not intend to keep. Douglas testified that he intended to swindle Williams because he bore resentment towards Williams over the arrest of his grandfather who had died in prison.

Douglas also denied that he confessed to selling Williams drugs. He admitted to asking the agents if he could serve as an informant but said he did so because he was intimidated after his arrest and the grilling by KAMEG agents. Douglas claimed that he had "never been through nothing like that" before.

At the conclusion of his direct examination, the government argued to the district court that Douglas's statement

that he had "never been through nothing like that" opened the door to inquiry about his prior drug convictions. The district court agreed and permitted the government to inquire into Douglas's 1989 and 1993 convictions. At the close of the case, the district court instructed the jury that these convictions could be considered only in assessing Douglas's credibility.

The jury found Douglas guilty on both counts of the indictment. Because Douglas had two previous felony drug convictions, and because of the quantity of the drugs involved in the transactions, Douglas was subject to, and accordingly sentenced to, mandatory life imprisonment. 21 U.S.C. § 841(b)(1)(A)(iii). This appeal followed.

## II.

Douglas raises three issues on appeal. First, he argues that the district court erred when it limited his ability to "cross-examine" a "government witness," namely Williams. Second, Douglas argues that the district court erred when it permitted the government to inquire into his previous drug convictions. Third, Douglas argues that the imposition of mandatory life imprisonment because of two previous drug convictions was unconstitutional in light of the Supreme Court's recent decisions concerning sentencing. We address each argument in turn.

### A. Williams's Testimony

Douglas first argues that the district court's ruling concerning the limits of his examination of Williams prevented him from establishing his theory of defense. Douglas sought to suggest that Williams actually brought the crack with him to the two sales and that he intended to frame Douglas by

claiming that he received the drugs from Douglas. Douglas argues that he should have been able to inquire into Williams's criminal history and impeach Williams's credibility.

In his briefs, Douglas characterizes the issue at hand as interference with his right to "cross-examine" Williams, whom he describes as a "government witness." But Douglas was not limited in *cross-examining* Williams. Williams was not a government witness. Williams was Douglas's witness. The district court limited Douglas's direct examination of Williams by refusing to allow Douglas to impeach William's credibility through references to Williams's criminal history.

Douglas argues that his constitutional rights were violated by the district court's decision. Where appropriate, a party is free to impeach the credibility of his own witness, *see* Fed. R. Evid. § 607 ("The credibility of a witness may be attacked by any party, *including the party calling the witness.*") (emphasis added). However, where such testimony is irrelevant, a party may properly be prevented from eliciting the testimony. That is the foundation of the rules of evidence. Fed. R. Evid. § 402.

The so-called impeachment evidence was not relevant. The government announced it did not intend to call Williams and, from the government's point of view, Williams was not an essential witness—every element of the factual narrative necessary to convince the jury of Douglas's guilt could be offered without Williams's testimony. Backus and Monferdini testified that they searched Williams and found no drugs on him or in his car. Then they followed him to the scene of his meeting with Douglas. They maintained visual contact with Williams from the time of the search through the sale and until at least one of them met up with Williams again and Williams handed over drugs. Assuming the jury believed Monferdini and Backus, their testimony was

enough to secure a conviction. Given that Douglas was the only person Williams met with between the time he was searched and the time he returned from the sale, a rational jury surely could infer that the Douglas was the source of the drugs Williams handed over after the sale.

Williams's credibility was not at issue. Because Monferdini and Backus claimed they kept visual contact with Williams from start to finish, the government's case rested on *their* credibility (supported by audio and visual recordings of the sales). Consequently, any evidence introduced to impeach Williams's credibility would be irrelevant and inadmissible. *United States v. Silva*, 71 F.3d 667, 670-71 (7th Cir. 1995). A party is not free to impeach the credibility of a witness simply for the sake of doing so. The district court did not err, therefore, in limiting Douglas's examination of Williams.

Douglas also argues that even if the limitation was appropriate initially, the government "opened the door" to a full "cross-examination" of Williams as a result of a question by the government to Monferdini and his response thereto. Specifically, Douglas cites the following exchange:

Q:  And have you reviewed Government Exhibit 4 [the audio recording of the April 30 sale]?

Q:  —on April 30?

A:  Yes.

Q:  And is it an accurate recording of what took place while Mr. Williams was wearing that recording device?

A:  Yes.

Q:  Is there anything significant in listening to that recording—was there anything significant that you noticed while listening to it?

A:   *Just I think at the end Mr. Williams asked Mr. Douglas if it was, if was good stuff and if there's a money-back guarantee.*

Q:   Are there portions that are inaudible?

A:   Yes.

Q:   And are there—does the remainder of that tape reflect a conversation that does not appear to relate to a drug transaction, just general conversation?

A:   Yes. Most of it's general conversation.

Appellee Br. 21-22 (emphasis added).

Douglas argues that Monferdini's recitation of Williams's question to Douglas was the equivalent of Williams testifying that he asked that question. Accordingly, Douglas argues, he then should have been able to fully cross-examine Williams as to his criminal history.

Douglas's argument on this point has no merit. Monferdini's statement did not put Williams's credibility at issue. The jury was told of the limited value of Williams's statements on the audio recordings. The district court instructed the jury twice (at the time of the audio recording's introduction into evidence and following Monferdini's testimony on direct) that Williams's statements or questions on the recordings were hearsay and could not be considered for the truth of the matter asserted. The district court did not err in refusing to lift its limits on Douglas's inquiry into Williams's past.

## B.  Douglas's Testimony

Douglas's conviction in this case was not his first felony conviction. Douglas had previously been convicted in Illinois courts for possession of drugs in 1989 and 1993. In

both cases, he received probation. Prior to trial, Douglas sought to prevent the government from eliciting information concerning these previous convictions for the purpose of impeaching Douglas. The district court ruled that the government could not make mention of the 1989 conviction—it fell outside the ten-year time period set forth in Federal Rule of Evidence 609(b). The district court ruled that the government could use the fact of Douglas's 1993 conviction but could not mention the name or nature of the conviction. The district court specifically cautioned Douglas that he might "open the door" and permit the government to explore "the nature of both of his prior convictions if, for example, he testifies in a manner suggesting lack of knowledge of controlled substances. . . ."

As recounted above, the district court later found that Douglas had indeed opened the door when he testified that he had offered to cooperate with the police despite his innocence because he had "never been through nothing like that." By "that" Douglas was referring to the police interrogation process he was the subject of subsequent to his arrest in this case. The government proceeded to question Douglas concerning his two previous convictions:

Q: Mr. Douglas, I heard you testify—I believe you testified that when Mr. Alvarado asked you about why you agreed to cooperate with law enforcement agents and why you spoke to them, you said that you were scared and—quote—never been through any—nothing like that before. Do you recall making that statement in response to a question that, of Mr. Alvarado?

A: Exactly.

Q: But that's not true, is it?

A: Pertaining—what's not true?

Q: You had been through something like that before, right?

A: No, not no questions. That's what I was talking about, the questioning that they had put me through.

Q: In 1993, you were convicted of unlawful possession of a controlled substance, correct?

A: Oh, yes, I was.

Q: You were arrested for that offense; were you not?

A: Exactly.

Q: And you were questioned at the time of your arrest?

A: Yeah. I was questioned.

Q: So you had been through being arrested and being questioned by law enforcement?

A: Yeah. I had been questioned by law enforcement.

Q: And that wasn't the only time you'd been arrested and convicted of a drug offense. In fact, four years earlier, in 1999, you were charged and convicted of unlawful possession of marijuana; isn't that right?

A: 1999? No.

Q: 1989.

A: Oh, '89, yes. '89.

Q: And you were arrested for that offense?

A: Yes. I was arrested for marijuana.

Q: And you were questioned at the time of your arrest?

A: No.

Q: But you were arrested?

> A:  Right. I was arrested.
>
> Q:  And you had been through—on at least two occasions where you ultimately were convicted of felony drug offenses, you had been arrested; and on at least one of those occasions, you had been questioned by law enforcement officers, correct?
>
> A:  Right. But I wasn't questioned vigorously like I was with the two gentlemen.
>
> Q:  You wasn't—you weren't questioned how?
>
> A:  I wasn't questioned like they had, you know, they was giving me some ultimatums and et cetera that particular day.

Appellant Br. 37-38.

Under Rule of Evidence 609, it can be proper for the government to impeach a criminal defendant with evidence of the defendant's prior convictions. Fed. R. Evid. § 609(a)(1); *United States v. White*, 222 F.3d 363, 370 (7th Cir. 2000). Generally, " 'the details of the prior conviction should not [be] exposed to the jury.' " *Id.* (quoting *United States v. Robinson*, 8 F.3d 398, 409 (7th Cir. 1993)). When a defendant "opens the door," however, by offering testimony that explains away an earlier conviction or offers testimony inconsistent with the facts underlying an earlier conviction, the government may inquire into the details of the conviction. *Id.* We have cautioned that an open door is not a "license to dwell on the details of the prior conviction and shift the focus of the current trial to the defendants's prior bad acts." *Id.*

Nothing of the sort happened here. The government did not dwell on the prior convictions. In fact, the government identified the specific crimes (possession of an unlawful controlled substance and possession of marijuana) briefly and the focus of the government's inquiry was not to draw

out details of the crimes but to show that Douglas had twice been in situations where police interrogation was likely—thus shedding doubt on Douglas's claim that he had "never been through nothing like that." The brief mention of the previous convictions did not "shift the focus of the current trial" to Douglas's two previous convictions. The mentions of Douglas's prior criminal record take up approximately one and one-half transcript pages of the thirty-six pages that record the government's cross-examination of Douglas.

Douglas's only complaint can be that the crimes at issue were drug crimes and that the mention of that might have poisoned the jury against him in the present drug case. Douglas's involvement with illegal drugs, however, was not alien to the jurors. On direct, Douglas had already admitted to having previously been involved in the "drug world."

Even if we were inclined to consider the district court's ruling erroneous, such an error would be harmless. The evidence against Douglas was overwhelming and included, as we have noted, audio and video recordings of the sales, the testimony of two agents who watched both transactions, and Douglas's own confession. In light of such evidence, we do not believe brief references to the types of crimes Douglas had previously been convicted of (assuming the references were impermissible) "had a substantial and injurious effect or influence on the jury's verdict." *United States v. Sutton*, 337 F.3d 792, 797 (7th Cir.), *cert. denied*, 124 S. Ct. 845 (2003).

## C. Douglas's Sentence

Douglas's final argument concerns the use of his prior convictions to increase his sentence to a mandatory sentence of life imprisonment. Douglas argues that his prior convic-

tions should have had to have been proven to a jury beyond a reasonable doubt. This argument is without merit. In its recent opinions concerning sentencing, *Blakely v. Washington*, ___ U.S. ___, 124 S. Ct. 2531 (2004), and *United States v. Booker*, ___ U.S. ___, 125 S. Ct. 738 (2005), the Supreme Court reaffirmed its holding in *Almendarez-Torres v. United States*, 523 U.S. 224, 244 (1998), that the fact of a prior conviction need not be proven to a jury beyond a reasonable doubt. *Blakely*, 124 S. Ct. at 2536 (*quoting Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("*Other than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.") (emphasis added); *Booker*, 125 S. Ct. At 756 ("Any fact (*other than a prior conviction*) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.") (emphasis added); *see also United States v. Rosas*, 401 F.3d 843, 846 (7th Cir. 2005) (per curiam).[1]

---

[1] As we have noted, Douglas was sentenced to life imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A)(iii). Douglas's sentence is not affected, therefore, by the Supreme Court's decision in *Booker v. United States*, ___ U.S. ___, 125 S. Ct. 738 (2005), which holds that the federal sentencing guidelines are not mandatory. Nor is it affected by this court's subsequent decision in *United States v. Paladino*, 401 F.3d 471, 483-85 (7th Cir. 2005), to remand cases to the district court when it is necessary to determine what sentence the district court would have imposed knowing it had the discretion it did not have pre-*Booker*. *See also United States v. Castillo*, Nos. 02-3584 & 02-4344, slip op. at 31 (7th Cir. May 3, 2005). Douglas's sentence is not a product of the guidelines; it is the result of an independent statute. Life sentences imposed pursuant to § 841 remain mandatory.

### III.

The district court did not err in prohibiting Douglas from impeaching Williams's credibility. The district court also did not err in permitting the government to inquire into Douglas's criminal history for the purpose of impeaching him. Douglas's sentence was not constitutionally invalid. The district court is

AFFIRMED.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*