In the

# United States Court of Appeals

## For the Seventh Circuit

No. 04-2063

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RANDELL D. THOMAS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 03 CR 158—**John C. Shabaz**, *Judge.*

SUBMITTED SEPTEMBER 9, 2005—DECIDED JULY 7, 2006

Before BAUER, POSNER and WOOD, *Circuit Judges.*

BAUER, *Circuit Judge.* Randell D. Thomas appeals his conviction for being a felon in possession of ammunition, 18 U.S.C. § 922(g)(1). He challenges multiple evidentiary decisions made by the district court during trial, the constitutionality of the aforementioned criminal statute as applied to his case, and the term of his sentence. We affirm the decision of the district court.

## I. Background

Early in the morning of October 10, 2003, Randell D. Thomas was involved in a shooting at 920 Park Avenue, in Beloit, Wisconsin. The incident involved four individuals:

Thomas, his girlfriend Enjoli McAlister, McAlister's cousin Byron Stewart[1], and Thomas's friend Michael Brown. The affair began with an argument between Thomas and McAlister. During the argument, McAlister was phoned by her cousin, Byron Stewart. Unfortunately, while talking with McAlister, Stewart described Thomas with unkind words and Thomas overheard the remark. Thomas took the phone and briefly spoke with Stewart, proposing that the two meet in front of McAlister's apartment. Thomas then called and invited his friend Michael Brown to join them. Within minutes, Brown arrived on bicycle.

Shortly after Thomas and Brown met outside of McAlister's apartment, Stewart arrived in a green Dodge Intrepid and parked in front of the building. When Stewart got out of the vehicle, Thomas challenged him to a fistfight. Stewart refused. Thomas then asked Brown to pass him a gun that he was holding so they could leave. At that point a struggle broke out; Stewart drew his own gun and opened fire. Thomas retrieved the gun from Brown's pocket and returned fire while Stewart fled.

In the aftermath of the gunfight, Stewart had fled the scene, Brown lay shot at the end of the Intrepid, and Thomas, shot in his right hand and rear left shoulder, was calling for help. Portions of these events were witnessed by numerous people, including McAlister and Raymond Stewart (Byron's uncle). The latter half of the incident was narrated in its entirety by an anonymous 911 caller.

In response to an emergency dispatch, Officer John Fahrney of the Beloit Police Department arrived at the scene within minutes of the shooting. He was flagged down by an excited Thomas, who asked if Fahrney was responding to his call. Fahrney then saw Brown lying prone behind

---

[1] Stewart is also known as Byron Hendricks; to connote the family relation with other witnesses we use Stewart.

the Intrepid. After surveying the scene, he interviewed McAlister and then escorted Thomas to the hospital. At the hospital, Thomas informed Officer Fahrney that he had argued with McAlister's cousin, who had pulled a revolver on him and Brown. Because Thomas could not remember Stewart's name, Officer Fahrney asked if he would be able to identify the shooter in a photographic lineup. Thomas demurred, stating that he would prefer to settle the matter by trading "bullet for bullet." Trial Tr. vol.1, 147, Feb. 9, 2004.

When Beloit Police officers searched the crime scene they recovered three .380 caliber bullet casings that were not tarnished, scuffed, or crushed; one from under the Intrepid and two in the grass adjacent to the vehicle. Additionally, the officers found a bullet hole in the garage door, bullet fragments inside the building garage, and what could possibly have been a "bullet impact" mark on the sidewalk. Trial Tr. vol.1, 166, Feb. 9, 2004. There was also blood in front of the apartment building, in the car, on the road near the curb, on the driveway, and just beyond the driveway. They did not find any firearms or bullets.

On November 20, 2003, a grand jury returned a one-count indictment against Thomas for the unlawful possession of ammunition by a convicted felon, 18 U.S.C. § 922(g)(1). He was arraigned on November 21, 2003.

On February 4, 2004, in preparation for trial, the government filed a motion *in limine* to have an audiotape of the 911 call admitted into evidence. The recording was relevant because the caller had been located, but told the police that she no longer remembered seeing a gun or telling the emergency dispatcher that she had seen a gun. Thomas objected to the evidence on Sixth Amendment grounds, arguing that admission of the recording would violate his right of confrontation. The government offered the testimony of the detective who had spoken with the caller and

the district court admitted the tape as both an excited utterance and a present-sense impression.

During the jury trial that began on February 9, 2004, the aforementioned facts were introduced through the testimony of a number of witnesses. Enjoli McAlister testified that initially Thomas did not have a gun, but when he called Brown she overheard him say "bring both of them." Trial Tr. vol.1, 92, Feb. 9, 2004. Later, when Stewart arrived, she saw Thomas remove a silver gun from his pocket which he gave to Brown to hold. After Stewart declined to fight, Thomas instructed Brown to return the gun. It was then that the brief struggle occurred, after which Stewart opened fire with another weapon. When Stewart ran out of ammunition, Thomas reached into Brown's pocket and retrieved the gun. He the returned fire from behind the Intrepid while Stewart fled the scene.

Following McAlister's testimony, the government played the tape-recording of the emergency call made at 3:55 a.m. on the morning of October 10, 2003. During the course of the three minute and fifty-three second recording, the caller reported that someone had been shot outside of her apartment, and that ". . . the guy who shot him is still out there." Trial Exh. 1. The emergency operator then asked a series of questions about the facts of the situation and the caller narrated what she was seeing as it happened. Initially, she noted that she hadn't seen the shooting, but that she had seen ". . . a gun, . . . a handgun." *Id*. Prompted by the operator, she described the two men outside of her apartment, both black males. One was walking and running around, and the other lay shot on the ground. Midway through the call, with voices audible in the background, the following exchange took place:

> 911 Operator: Is that him in that background that's talkin'?

Complainant: Well now I don't know if that's who shot him. Maybe the person who shot him ran and that's who he was shottin' at.

911 Operator: But you're not really sure if he's there or not . . .

Complainant: I'm not, I'm not sure . . . I think the dude who shot him, now, ran, and that's why he was shootin'. His friend's shot on the ground and he's askin' him: where is he shot at? And he's not talkin'. But there is somebody shot outside, somebody needs to be sent over here, and there's somebody runnin' around with a gun, somewhere." *Id.*

The caller narrated the actions of the man standing in the street until the police arrived. Towards the end of the call, the dispatcher attempted to get the caller's name, but she refused, citing a concern for her personal safety. She was later identified and questioned by the police, but did not remember seeing a gun or ever having told the dispatcher that she had seen one.

The government also called Raymond Stewart and Travis Ryan to testify. Raymond Stewart testified to having witnessed the end of the incident. He told the jury that the sound of gunfire woke him and so he went to his window and saw an individual, too small to be his nephew, running down the street firing a gun with his right hand. This man then returned to the Intrepid to check on a second person lying down behind the car. Travis Ryan had shared a cellblock with Thomas at the Dane County jail before Thomas's trial. Ryan testified that Thomas had admitted to possessing and firing a .380 caliber gun the night of the shooting, and that he stashed it behind the building after the fight. Ryan also stated that Thomas told him he was always "strapped." Trial Tr. vol.1, 186, Feb. 9, 2004.

As their last witness, the government called Special Agent William Baudhuin, with the Bureau of Alcohol,

Tobacco, Firearms, and Explosives. Baudhuin testified that the shells found at the crime scene were made by Companhia Brasileira Cartuchos, and imported to the United States by Magtech, a company in Centerville, Minnesota.

Thomas took the stand in his defense. He testified that after Stewart refused to fight, he and Brown started to walk away. Stewart, he said, then attempted to rob them at gunpoint. When they tried to fight off the robbery, Stewart shot them both and fled the scene. Thomas testified that he then walked around the front of the building repeatedly calling for help, while bleeding from his hand. He then checked on Brown and kicked in the window of the Intrepid to draw attention to himself. Once in the vehicle, he removed a cell phone and attempted to call the police. Ultimately, he stepped into the street and hailed Officer Fahrney's patrol vehicle.

Thomas denied possessing a gun or ammunition that night, or having told Brown to bring "both of them." He also denied telling Travis Ryan that he always had a gun, that he had one on the night of the shooting, or that he ran from the front of the building to hide the gun. He explained that he and Ryan spent some time working on his case while in prison, and that Ryan must have fabricated the information after reading his file. Finally, Thomas disputed McAlister's claim that he drew a gun from Brown's pocket, and explained that he was trying to find a cellular phone.

The prosecutor attacked Thomas's testimony and credibility on cross-examination. Under questioning, he admitted to having repeatedly lied to police officers during prior arrests and to having pleaded guilty under assumed names. He also denied telling Officer Fahrney that Stewart's gun was a revolver or that he wanted to trade a bullet for a bullet. The prosecutor pressed this point and questioned Thomas on the factual conflict between his testimony and

that of McAlister and Fahrney. The following exchange then took place:

> Government: So your testimony as you sit here today is that Enjoli McAlister is a liar?
>
> Defendant: Of course.
>
> Government: And that Officer Fahrney is a liar?
>
> Defendant: He left out details. I wouldn't exactly call him a liar. He's a pretty nice guy."

Trial Tr. vol.1, 256-57, Feb. 9, 2004.

After a little more than three hours of deliberation, the jury found Thomas guilty.

Thomas was sentenced to the statutory maximum of 120 months in prison, followed by three years of supervised release, and a $100 special assessment. The sentence was imposed after the district court adopted the information presented in the Pre-Sentence Report (PSR). Based upon these facts, the district court found Thomas's base offense level to be 24, his total offense level to be 30, and his criminal history category to be V. This calculation yielded a Guideline range of 150 to 188 months. In his final comment on the sentence, Judge Shabaz stated: "Does the criminal history adequately represent Category V? No, it doesn't. In any other case the Court would increase the criminal history category to VI, but because of the limit of 120 months there's really no reason at this point to do so." Sentencing Hr'g Tr. 10, Apr. 20, 2004. The judgment was docketed on April 20, 2004.

Thomas filed a timely notice of appeal on April 22, 2004, pursuant to 28 U.S.C. §§ 1291, 1294, and 18 U.S.C. § 3742(a)(1)-(2). In doing so, he raised the following issues: (1) the government's use of the tape-recorded emergency call at trial violated his right to confrontation; (2) the district court erred in preventing Officer Fahrney from

testifying regarding Thomas's statement at the scene of the crime; (3) the government improperly questioned the defendant at trial; (4) that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to the instant facts; and (5) that because his sentence was determined under a mandatory scheme, it should be remanded for further consideration.

## II.  Analysis

### A.  Defendant's Right to Confrontation

Thomas first argues that the use of the tape-recorded 911 call at his trial was a violation of his Sixth Amendment right to confrontation. We review evidentiary rulings that affect this right de novo. *United States v. Gilbertson*, 435 F.3d 790, 794-95 (7th Cir. 2006).

The Sixth Amendment to our Constitution dictates that in all "criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI; *Pointer v. Texas*, 380 U.S. 400, 403 (1965) (applying the Sixth Amendment to the States); *see Bintz v. Bertrand*, 403 F.3d 859, 865-67 (7th Cir. 2005) (reviewing the Supreme Court's evolving interpretation of the Confrontation Clause). But this simple text leaves room for interpretation regarding who, exactly, bears witness. In *Crawford v. Washington*, the Supreme Court held that the right to confrontation bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. 36, 53-54 (2004). The Court, however, declined to offer a comprehensive definition of "testimonial," and wrote that, at a minimum, the term applies to "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id*. at 68.

In the recently decided *Davis v. Washington*, however, the Supreme Court provided a working test to distin-

guish testimonial from nontestimonial statements in the limited context of police interrogations. *Davis v. Washington*, 547 U.S. ___, *7 (U.S. June 19, 2006). In *Davis*, the Court held:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *Id.*

When viewing the facts in light of *Davis*, we find that the anonymous caller's statement to the 911 operator was nontestimonial. In *Davis*, the caller contacted the police after being attacked, but while the defendant was fleeing the scene. *Id.* at *1-3. There the Supreme Court stressed that, despite the immediate attack being over, the caller "was speaking about events *as they were actually happening*, rather than 'describ[ing] past events.'" *Id.* at *12 (citation omitted) (emphasis in original). Similarly, the caller here described an emergency as it happened. First, she directed the operator's attention to Brown's condition, stating "[t]here's a dude that just got shot . . .", and ". . . the guy who shot him is still out there." Trial Exh. 1. Later in the call, she reiterated her concern that ". . . [t]here is somebody shot outside, somebody needs to be sent over here, and there's somebody runnin' around with a gun, somewhere." *Id.* Any reasonable listener would know from this exchange that the operator and caller were dealing with an ongoing emergency, the resolution of which was paramount in the operator's interrogation. This fact is evidenced by the operator's repeatedly questioning the caller to determine who had the gun and where Brown lay injured. Further, the caller ended the conversation immedi-

ately upon the arrival of the police, indicating a level of interrogation that was significantly less formal than the testimonial statement in *Crawford*. 541 U.S. at 38-41. Because the tape-recording of the call is nontestimonial, it does not implicate Thomas's right to confrontation.

Where a hearsay statement is found to be nontestimonial, we continue to evaluate the declaration under *Ohio v. Roberts*, 448 U.S. 56 (1980).[2] *See Crawford*, 541 U.S. at 68 (reasoning that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether"); *see also United States v. Danford*, 435 F.3d 682, 687 (7th Cir. 2005). *Roberts* held that proffered hearsay may be admitted where it "falls within a firmly rooted hearsay exception." 448 U.S. at 66; *see White v. Illinois*, 502 U.S. 346, 356-57 (1992). Because of the nature of the call and conversation, we hold that the district court did not err in admitting the tape-recording under Federal Rules of Evidence 803(1), present sense impression, and 803(2), excited utterance.

## B. Defendant's Statement at the Scene of the Crime

Thomas next argues that the district court erred in excluding his statements made to Officer Fahrney when the

---

[2] We recognize that *Crawford v. Washington*, 541 U.S. at 60, overruled, in part, *Ohio v. Roberts*, and that *Davis v. Washington* reaffirmed this fact. *Davis*, \*10, n.4, \*19. While at first glance, *Davis* appears to speak of *Roberts* being overruled in general, a closer reading reveals that the discussion of *Roberts* occurs strictly within the context of statements implicating the Confrontation Clause. *Id*. Where the Court addresses nontestimonial statements such language is conspicuously absent.

police first arrived at the scene of the crime. We review the trial court's refusal to admit evidence for abuse of discretion. *United States v. Cash*, 394 F.3d 560, 564 (7th Cir. 2005). An abuse of discretion is found only where no reasonable person would agree with the decision made by the trial court. *Id.*

During the cross-examination of Officer Fahrney, defense counsel posed questions designed to elicit the remarks Thomas made when Fahrney first arrived at the scene of the shooting. Counsel queried if Thomas had asked if Fahrney was responding to his call, or told Fahrney his cousin had been shot. The government objected, citing hearsay, and the district court sustained the objection. These statements were not hearsay. Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Thomas's first remark was not a statement, it was a question. FED. R. EVID. 801(a). His second remark, regarding his cousin having been shot, was not offered to prove the truth of the matter. Counsel did not ask Fahrney if Thomas had mentioned this because there was a doubt about Brown having been shot. The question was posed at trial because counsel wanted to elicit evidence that Thomas was concerned for Brown's health. Failure to allow this testimony at trial was an abuse of the district court's discretion.

Even if the statement had been admitted, nothing would have come of it. Reversal, the relief which Thomas seeks, is not required where the error is harmless. *United States v. Moore*, 115 F.3d 1348, 1358 (7th Cir. 1997). As defined by Federal Rule of Criminal Procedure 52(a), "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Here, evidence of Thomas's remarks that he had called for help, and his overall concern for the health of Brown, was admitted on three other

occasions during trial. The jury was well aware of these statements, and convicted Thomas nonetheless. We see no reasonable possibility that the exclusion of Fahrney's version of the statement had "a substantial and injurious effect or influence on the jury's verdict." *United States v. Douglas*, 408 F.3d 922, 929 (7th Cir. 2005).

### C.  Prosecution's Line of Questioning

Thomas next seeks reversal on the basis of the prosecution's questioning during his cross-examination and comments made during closing arguments. Because he did not object at trial, we review this claim for plain error only. FED. R. CRIM. PRO. 52(b); *United States v. Olano*, 507 U.S. 725, 732-34 (1993). To garner relief, Thomas must show that (1) there was an error; (2) the error was plain, clear, or obvious; and (3) the error affected his substantial rights, meaning it must have affected the outcome of the district court proceedings. *Id.*; *United States v. Walker*, 447 F.3d 999, 1005 (7th Cir. 2006). In considering this third factor, we emphasize the curative effect of jury instructions and "the weight of the evidence of guilt contained in the entire record." *United States v. McKee*, 389 F.3d 697, 699 (7th Cir. 2004).

At the close of Thomas's cross-examination, the prosecutor questioned him on the disparities between his testimony and that of Officer Fahrney and Enjoli McAlister. Thomas denied the truth of their statements. The prosecutor pressed on, asking if it was Thomas's testimony that Fahrney and McAlister were liars. Thomas responded affirmatively as to McAlister, but distinguished Fahrney. Fahrney, he said, ". . . left out details. I wouldn't exactly call him a liar. He's a pretty nice guy." Trial Tr. vol. 1, 256-57, Feb. 9, 2004. Later, during closing arguments, the prosecutor returned to this exchange and attempted to discredit Thomas by telling the jury he had called Fahrney and

McAlister liars. Trial Tr. vol. 2, 21, Feb. 10, 2004. Thomas argues that these statements amounted to plain error, and that together they were sufficient to influence the jury's verdict.

Because the evaluation of witness credibility is the province of the jury, "'it is improper to ask one witness to comment on the veracity of the testimony of another witness.'" *McKee*, 389 F.3d, at 699 (citing *United States v. Freitag*, 230 F.3d 1019, 1024 (7th Cir. 2000)). The government acknowledges as much, and concedes that the initial line of questioning was in error. But we must separate the questions asked during cross-examination from the comments made during closing argument. We find the questions were improper, and the error on this point plain. Regarding the comments at closing argument, however, we note that a prosecutor may "properly comment on the credibility of witnesses as long as the comment reflects reasonable inferences drawn from the evidence presented at trial rather than personal opinion." *Id.* (citing *United States v. Morgan*, 113 F.3d 85, 89 (7th Cir. 1997)). We are left then, with the implication of this error for Thomas's substantial rights.

Similar to *McKee*, the curative effect of the jury instructions and the weight of the evidence in the record indicate that the comments were not sufficient to influence the jury's verdict. At the end of closing arguments, the district court instructed the jury as follows: "You are to decide whether the testimony of each of the witnesses is truthful and accurate in part, in whole, or not at all, as well as what weight, if any, you give to the testimony of each witness." Trial Tr. vol. 2, 44, Feb. 10, 2004. Additionally, this instruction was followed by a reminder to evaluate the defendant's testimony "in the same way as you would judge the testimony of any other witness" and that "[a]ny inference you make must be reasonable and must be based on the evidence in the case." *Id.* at 45.

Further, the cumulative effect of the additional evidence in the record created an inculpatory mass not likely swayed by this limited error. Of particular importance were the statements made during the 911 call, which, when paired with the testimony of McAlister and Fahrney, painted a complete picture of that night's events. First, McAlister testified that Thomas retrieved the silver gun from Brown's pocket when Stewart ran out of ammunition. As Stewart fled, Thomas returned fire while standing at the rear of the Intrepid. Second, when talking to the emergency operator, the caller described two separate shooters, one of whom ran around the front of the building, but then returned to his wounded friend who lay at the rear of the Intrepid, where he stayed until the police arrived. Finally, Officer Fahrney testified that he arrived at the crime scene to find Thomas standing near the body of Brown, who lay at the end of the Intrepid. These three stories, provided by wholly unrelated witnesses, neatly mesh together to create a deeply persuasive time line of events for that unfortunate morning. Despite the error at trial, we deny Thomas relief on this claim.

### D. Constitutionality of 18 U.S.C. § 922(g)(1)

Thomas briefly challenges the constitutionality of 18 U.S.C. § 922(g)(1) as applied to his "purely intrastate" possession of ammunition. Plaintiff's Br. 48. Because he failed to raise this argument at trial, we review his claim for plain error. *United States v. Olano*, 507 U.S. 725, 732-34 (1993).

Section 922(g) does not require the government to prove Thomas was responsible for the interstate transportation of the ammunition he was found to possess. It requires, instead, a showing that the possession of the ammunition was "in or affecting commerce." *Id*. He argues that this lesser burden is an unconstitutional exercise of the Com-

merce Clause. U.S. CONST. art. I, § 8, cl. 3. But this argument fails. As we have held before on multiple occasions, this jurisdictional element of § 922(g) satisfies the requirements of our Commerce Clause jurisprudence. *See United States v. Vallejo*, 373 F.3d 855, 860-61 (7th Cir. 2004) (remanded on separate grounds); *United States v. Keller*, 376 F.3d 713, 716-17 (7th Cir. 2004) (remanded on separate grounds); *United States v. Lemons*, 302 F.3d 769, 771-73 (7th Cir. 2002); *United States v. Mitchell*, 299 F.3d 632, 634-35 (7th Cir. 2002); *United States v. Bell*, 70 F.3d 495, 497-98 (7th Cir. 1995). Until the Supreme Court provides further guidance on the matter, our decisions stand.

### E. Sentencing

Lastly, Thomas challenges the term of his sentence. He argues that the district court erred in finding certain aggravating factors by a preponderance of the evidence only, and that these findings were then imposed under a mandatory sentencing scheme contrary to *United States v. Booker*, 543 U.S. 220 (2005). He did not make these arguments at trial, however, so we review his claims for plain error. *United States v. Paladino*, 401 F.3d 471, 481 (7th Cir. 2005). Thomas bears the burden of demonstrating this plain error under Federal Rule of Criminal Procedure 52(b). *See Olano*, 507 U.S. at 732-34; *United States v. Lee*, 399 F.3d 864, 866 (7th Cir. 2005).

For Thomas to prove plain error, he must, among other things, establish that the error violated his substantial rights–"which is to say that it made the defendant worse off." *Lee*, 399 F.3d, at 866. This he cannot do. At the sentencing hearing, the district court adopted the information provided in the PSR. Based upon the jury's verdict and his prior controlled substance offenses, Thomas's base offense level was 24. The district court, however, found that Thomas possessed the ammunition in connection with

another felony offense (the gunfight) and that he obstructed justice by committing perjury during the trial. With these findings, the judge increased Thomas's offense level to 30. When the court paired the level with his criminal history category of V, it yielded a Guideline range of 151 to 188 months. But Judge Shabaz thought this wasn't high enough. He explicitly stated that he would prefer to increase Thomas's criminal history category to VI, but that the 120 month statutory maximum made the increase irrelevant.

As we wrote in *Lee*, where the district court judge expresses a preference to give a higher sentence and the actual sentence was well below the calculated Guideline range, the defendant fails to show that the error affected his substantial rights. *Lee*, 399 F.3d, at 867. Given the district court's comments on the record, and the § 922(g) maximum sentence, we can be sure that Thomas would be in no better situation were we to remand his case for resentencing. Therefore, his substantial rights were not affected and his claim on this point fails.

### III. Conclusion

The defendant's conviction is AFFIRMED.

No. 04-2063                                                     17

A true Copy:

    Teste:


                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*