In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-2412

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MORRIS CARTER,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 04 CR 104—**Rudy Lozano**, *Judge.*

———————

ARGUED JANUARY 25, 2008—DECIDED JUNE 19, 2008

———————

Before FLAUM, ROVNER, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* Defendant Morris Carter, who served as the elected Recorder for Lake County, Indiana, was convicted for three counts of extortion in violation of the Hobbs Act, 18 U.S.C. § 1951(a), and sentenced to 51 months' incarceration. Carter now raises three issues before this Court on appeal. First, Carter challenges the sufficiency of the evidence for his convictions, claiming that the government failed to prove that his actions affected interstate commerce or that he acted under color of right. Carter's second claim is that the Government engaged in an improper line of questioning

during his cross-examination. For the reasons discussed below, we affirm the district court's judgments on these two issues, but remand for resentencing based on Carter's final claim that the district court misapplied the proper post-*Booker* standards for sentencing.

## I. Background

### A. Defendant's Criminal Conduct

Carter was elected to two consecutive terms as the Lake County Recorder, with his second term concluding in December 2004. The acts of extortion for which Carter was convicted all occurred during the summer of his last year in this office. Central to the Government's case was the assistance it received from Peter Livas, an FBI informant. Livas owned three Indiana-based Subchapter S corporations—GIN Development, B & L Construction, and API Construction, Inc.—all of which were real estate rehab and development companies. Livas first came into contact with Carter through a mutual acquaintance, Javier Miranda, a subcontractor. During a conversation between Livas and Miranda in 2004, Livas told Miranda that he was trying to refinance his personal residence in order to free up more money for him to purchase properties. When Livas explained that this process had stalled due to a lien on the house, Miranda indicated that he would be able to help him with that. Miranda then set up a lunch meeting with Carter and Livas. During this meeting, Livas discussed the lien on his house with Carter, as well as his interest in buying vacant land in Gary, Indiana. The three individuals also discussed becoming partners based on what they each could do for each other, with Carter having an inside

connection to foreclosure sales, Miranda and Livas having rehab expertise, and Livas having the funds to purchase properties. Carter, however, testified at trial that he told Livas and Miranda that due to his position as Lake County Recorder, he could only be brought in as a consultant on retainer. After this lunch meeting, Livas contacted the FBI about the matter. Livas agreed to cooperate with the FBI and for the rest of the investigation, he wore a wire or a video recorder during all face-to-face communications with Carter.

The first audio recorded meeting between Carter, Livas, and Miranda occurred on June 2, 2004 in Gary, Indiana, where Carter had arranged for Livas to look at some properties. During this meeting, the three discussed two things Livas sought: a contractor's license for building in unincorporated areas of Lake County, and lists of homes in foreclosure that would be placed on sheriff's tax and commissioner's sales. With respect to the lists of homes, Carter maintained that he could get "the first look at the list" since he was "taking care of" a woman working in the department that had access to the lists. Livas was later told that these lists would cost $1,000.

Carter, Livas, and Miranda next met on June 11, 2004. This conversation was videotaped by the Government. At this meeting, Livas paid Carter $1,000, which Livas testified at trial was for the property lists, although Carter maintained that this money was for work he had already done as part of their consulting relationship. Carter then supplied Livas with the tax and commissioner's lists. Carter explained to Livas that he had access to the list because "[t]he girl who's got the list is a personal friend of mine," and when told by Livas to "treat her nice," Carter stated that "what I do is, I always kick these people

out . . . what they ask for." Although at trial, Carter claimed that these lists were publicly available at the time, at the June 11 meeting, Carter told Livas that "[n]obody has this list." Additionally, Livas later told FBI Agent Bradley Showalter, who testified at trial, that he gave the lists to Livas before they were made public, and that his connection with the woman in the Auditor's Office who provided him with the lists stemmed from his work resolving a conflict between the Auditor's Office and the Recorder's Office.

The other matter discussed at the June 11 meeting was the county contractor's license Livas sought, the receipt of which partially depended upon passing a written test. Carter instructed Livas to report to Carter's office on June 16, 2004, where Carter would "hook up" Livas with a "guy," who Livas later found out was Jan Donald Allison, the person who administered the test and served as the Assistant Lake County Building Administrator. Carter instructed Livas not to discuss money with the "guy," but instructed Livas to bring $500 to Carter's office at the June 16 meeting.

The June 16 meeting at Carter's office was also videotaped. Once both Miranda and Livas had arrived, Carter started the meeting by warning them not to use his name when calling him, and pointed out a recent newspaper article discussing criminal charges related to tax sales in Lake County. Carter made clear that "things have to be done a certain way" because he "don't want nobody to get the wrong impression" and "ain't trying to go to jail." The three then turned to discussing Carter's contractor's license. With respect to the $500 Carter was charging Livas for the license (the license itself only cost $150), Livas explained that he would have the money after he

got paid for one of his rehabbing projects. In response, Carter instructed Livas to pay him by giving the money to Miranda, who would then pass it along to Carter. Carter then called Allison and sent Livas and Miranda upstairs to meet with him, instructing Livas not to mention money with Allison. Carter had told Allison that Livas was a "friend" and asked if Allison could "help" Livas get a contractor's license. During the meeting with Allison, Livas received a license application, which he later completed on behalf of B & L Construction and submitted along with a $50 application fee drawn from B & L's bank account.

On June 24, a hidden camera captured Livas paying Miranda the $500 for the contractor's license, which Miranda then passed along in full to Carter. Approximately one month later, on July 23, Livas took the contractor's license exam. Livas intentionally failed the exam and Allison, when grading it, filled out a new examination with a passing score. Later that day, Allison went to Carter's office to tell Carter that Livas had passed the test. Carter later sent Allison a thank you card which included $100 in cash.

Less than a week after taking the contractor's exam, on July 28, Carter and Livas had a videotaped discussion regarding the lien on Livas's home. Carter conceded at trial that he had asked the Recorder's Office in-house counsel to research Livas's lien (although the attorney never knew Carter was doing this for money), since the Recorder's Office was already dealing with a flurry of similar cases due to the refinancing craze at the time. Based on this research, Livas informed Carter at their meeting that the lien had expired and all that was required was a purge of lien document that would reflect

its expiration. The two then agreed that Livas would stop by Carter's office the next day to pick up the Purge of Lien Notice, and the meeting ended with Livas paying Carter $400 in cash. The next day, Livas picked up and signed the Purge of Lien Notice that Carter had prepared. Carter and Livas then took the document to a woman at the office who filed the Purge of Lien Notice. Carter told Livas that he would take care of the $17 filing fee, and Livas received a receipt stating that the fee had been paid. The Purge of Lien Notice did not actually purge the lien, however, but instead only provided notice that it had apparently expired. When Livas later hired an attorney to validly purge the lien, it was discovered that the lien had never been valid to begin with.

## B.  Trial

On December 1, 2004, Carter was indicted on three counts for violations of the Hobbs Act, 18 U.S.C. § 1951(a), and aiding and abetting under 18 U.S.C. § 2. The first count charged Carter with extorting $400 from Livas, under color of right, for purging the lien. Count 2 was against both Carter and Allison, charging them with extorting $500 in exchange for them, under color of right, providing Livas with a contractor's license. The final count charged Carter with extorting $1,000 in exchange for property lists that Carter held out as being unavailable to the general public.

Allison pled guilty to Count 2 in the indictment on March 9, 2005, and as part of his plea agreement, agreed to cooperate with the Government in its case against Carter. Allison detailed his and Carter's involvement in procuring Livas's license to the FBI after Allison found out

from the FBI that Carter, unbeknownst to him, had received $500 from Livas for the license.

Carter's three-day jury trial went from January 17-19, 2006. Livas testified against Carter, with his testimony interspersed with presentations to the jury of the video-taped conversations between him and Carter. Miranda and Allison also were called to testify by the Government, as was the Government case agent, Agent Bradley Bookwalter, and Carolyn Pollard, the Chief Deputy Recorder for Lake County, who testified to certifying the Purge of Lien Notice. In order to establish that Carter's extortion actions affected interstate commerce, as is required by the Hobbs Act, the Government also called Donald Cook, an employee at an Indiana paint store, who testified that the store's paints were ordered from Ohio and that Livas, as a contractor, had maintained an account at the paint store for over three years.

Carter testified in his own defense, arguing that he was working in a consulting capacity, and that the three payments Carter had received—for $1,000, $500, and $400—were nothing more than payments towards an agreed to $2,000 consulting retainer fee. During the Government's cross-examination of Carter, he was asked about the credibility of the Government's witnesses. This began when the Government pressed Carter on his claim that the $500 was not for the contractor's license, but was instead part of a $2,000 consulting retainer. When the Government inquired as to whether Carter remembered that Livas had testified to the Government's version of events, Carter responded, "Yes, he told a lie." This then prompted the Government to ask, "Pete [Livas]'s lying, right?" to which Carter replied, "Absolutely." The same question and response followed with respect to

Allison and Miranda. Questioning on this issue con-
tinued, with Carter stating when asked that he didn't
know Don Cook, the paint store employee, enough to
know whether he was lying, but opined that all the Gov-
ernment witnesses had an incentive to lie. Carter offered
that he was "speaking the truth, because my life is on the
line here," and then, when prompted by the Govern-
ment, again stated "absolutely," that Agent Bookwalter
had lied. Finally, when the Government began inquiring
whether Carolyn Pollard, the Lake County Recorder's
Office employee, had lied, Defense counsel objected to
these credibility questions. The district court overruled
the objection, but the Government at that point moved
on to another line of questioning.

The issue of witness credibility came up again later
in cross-examination. When the Government asked
Carter whether he remembered Miranda testifying that
morning on the stand that Livas "was paying $400 to get a
lien removed," Carter replied, "Yes, he told a lie this
morning." Then, when the Government was concluding
its questioning into the $400 payment, the Government
asked Carter about his position on the matter, stating, "the
$400 that was paid had nothing to do with the lien . . . and
you were just trying to collect on your $2,000 retainer,
correct?" When Carter responded, "Every step of the
way," the Government followed up by asking, "So Javier
[Miranda] and Pete [Livas] are both lying, correct?" Carter
replied, "You know they are." The Government asked
Carter to reiterate his position that the Government
knew Miranda and Livas were lying, which Carter did,
all without objection by Defense counsel.

At the close of both the Government's case in chief and
Defendant's evidence, Defense counsel made a motion

for judgment of acquittal, which was denied by the district court on both occasions. The case thus went to the jury, with the Government proceeding solely on an attempted extortion theory of the case. The jury was instructed that it was its role to determine the credibility of the witnesses, and after deliberations, returned a guilty verdict on all three counts.

### C. Sentencing

A sentencing hearing was held on May 8, 2006. The Presentence Investigation Report ("PSR") calculated a Guidelines range sentence of 51-63 months, based in part upon a two-level enhancement for being an organizer, leader, manager, or supervisor of less than five people under U.S.S.G. § 3B1.1(c). Carter objected to this enhancement, but the district court found that the evidence showed Carter was a leader in the conduct.

When the time came for sentencing, Defense counsel requested that Carter be given a below-Guidelines sentence. Defense counsel first argued that the district court should consider the fact that not all of Carter's interactions with Livas involved illegal activity or his connection to the Lake County Recorder's Office. Counsel then requested a below-Guidelines sentence based on Carter's long history of public service in the Recorder's Office prior to these charges. The district court inquired as to whether public service had ever been utilized as a valid grounds for departure. The court then went on to state that it did not "have a problem with the departure," but in light of apparent pressure from Congress regarding adherence to the Guidelines, was unwilling to do so without some authority. Defense counsel conceded that

he had not found any case allowing this as a grounds for departure, but continued pressing the point, ultimately urging the court to award a sentence of 41 months, which would have been the Guideline minimum range if the two-point enhancement for being a leader had not been included.

After Carter himself made a statement, the district court explained its reasoning behind the sentence. The court noted that it had spent a lot of time on the case, including independent research into whether a grounds for departure existed for service in public office. The district court then went on to say that it had looked at the Guidelines and found them "to be fair and reasonable." The court also discussed the need to deter public corruption, along with Carter's particular circumstances, which included his family as well as his lack of remorse. The court then sentenced Carter to 51 months, the low end of the Guidelines range.

## II. Analysis

Carter now appeals, bringing three issues before this Court. He first appeals the district court's denial of his motion for judgment of acquittal, arguing that there was insufficient evidence to find that his alleged conduct affected interstate commerce or was performed under color of right. His second challenge concerns the Government's cross-examination of Carter with respect to the credibility of other witnesses. Finally, Carter argues that the district court failed to recognize the discretionary role the Guidelines are to play at sentencing.

### A.  Sufficiency of the Evidence

Turning to the first issue appealed, we review the district court's denial of Carter's motion for judgment of acquittal *de novo. United States v. Lee*, 439 F.3d 381, 384 (7th Cir. 2006). We examine the evidence in the light most favorable to the Government to determine whether any rational juror could have found the elements for a conviction under the Hobbs Act satisfied beyond a reasonable doubt. *United States v. Henningsen*, 387 F.3d 585, 589 (7th Cir. 2004).

The Hobbs Act makes it a criminal offense to obstruct, delay, or affect interstate commerce by actual or attempted extortion. 18 U.S.C. § 1951(a). "Extortion" under this Act is defined in part as "the obtaining of property from another, with his consent, . . . under color of official right." 18 U.S.C. § 1951(b)(2). Carter contends that the Government failed to provide sufficient evidence to show that interstate commerce was affected or that the extortion occurred under color of right.

While the Hobbs Act requires that the extortion must have an effect on interstate commerce, this Court has repeatedly held that only a *de minimis* effect must be shown. *United States v. Peterson,* 236 F.3d 848, 851-52 (7th Cir. 2001). Furthermore, because the Hobbs Act also criminalizes attempted crimes, it is not required that there be an actual effect on interstate commerce; a showing that the conduct "had the potential to impact commerce" is sufficient. *United States v. Re*, 401 F.3d 828, 835 (7th Cir. 2005).

The Government in this case sought to satisfy the interstate commerce requirement through the "depletion of assets" theory. Under this method, it is sufficient for the

Government to show that a business that customarily purchases items through interstate commerce had its assets depleted through the acts of extortion, thus limiting its ability to purchase goods in interstate commerce. *Peterson,* 236 F.3d at 854. There is no requirement that the business directly purchase its items through interstate commerce, rather, it is enough if the business purchases such items through a wholesaler or other intermediary. *United States v. Hocking*, 860 F.2d 769, 777 (7th Cir. 1988). Moreover, it is of no consequence if the money used was the FBI's, rather than that of the business itself. *Id.* (citing *United States v. Rindone*, 631 F.2d 491, 492-93 (7th Cir. 1980)).

The applicability of the depletion of assets theory in this case largely turns on whether the Government provided sufficient evidence showing that Carter's three Indiana-based corporations purchased items through interstate commerce. To establish this link, the Government called Donald Cook as a witness, Store Manager of ICI Paints in Hammond, Indiana. Cook testified that ICI Paints purchases its paints from Huron, Ohio, and that Livas was a "contractor customer" at ICI Paints, having held an account at the store for more than three years. Additionally, Livas himself testified that as part of his work rehabbing homes, he purchased paint from ICI Paints. Nonetheless, Carter argues on appeal that there was no evidence presented to specifically show that Livas's *businesses* purchased the paint from ICI Paints, rather than Livas purchasing the supplies in his individual capacity. While this distinction was not specifically addressed in the trial testimony, given the standard of review for sufficiency of the evidence, this is certainly a reasonable inference for the jury to have drawn. Livas testified that he purchased paint from ICI Paints for his

rehabbing projects, and Cook testified that he knew Livas as a "*contractor* customer." Given that Livas's corporations were all engaged in developing and rehabbing homes, a jury could reasonably conclude that the paint purchases were made for these businesses.

Carter additionally argues, however, that even if the paint purchases were made by Livas's corporations, there was insufficient evidence for a jury to conclude that the payments made to Carter would have depleted Livas's corporate assets, rather than his own personal accounts. This argument also fails. Again, to the extent this money was provided by the FBI, this is of no consequence to the depletion of assets theory's applicability. *See Rindone*, 631 F.2d at 494. Turning specifically to the $1,000 Livas paid for the property lists, given that it is reasonable to infer that any property purchased through these lists would then be developed by Livas's companies, it is also reasonable to infer that the $1,000, if not provided by the FBI, would have come from Livas's corporate funds. Similarly, the contractor's license Livas received was for B & L Construction, one of Livas's companies, and the $500 Livas paid to Carter for this license came from his receipt of funds from a "side job." Here too, there was sufficient evidence for the jury to link the payment to a depletion of Livas's corporate assets.

With respect to the Purge of Lien Notice Livas paid Carter $400 for, Carter argues that because the lien was on Livas's personal residence, the payment was not associated with Livas's corporations and thus no effect on interstate commerce can be shown. In making this argument, Carter relies heavily upon this Court's opinion in *United States v. Mattson*, 671 F.2d 1020 (7th Cir. 1982). In that case, this Court held that the depletion of assets

theory was inapplicable, since the extortion payment clearly came from the *personal* assets of the license seeker, not the *corporate* assets of the licensee's employer, when it was the corporate assets that were also used to purchase goods in interstate commerce. *Id.* at 1024-25. Here, the jury could reasonably infer that the benefit of the lien being purged on Livas's personal residence would ultimately benefit Livas's business ventures, since he hoped to refinance his residence in order to provide him with more money to purchase properties. This link to Livas's businesses, however, is somewhat weaker than it was for the lists and the license, as is the connection between the $400 paid to Carter to have the lien purged and Livas's corporate assets.

Regardless, although this link between the $400 and Livas's corporate accounts may not be particularly strong, it is not nonexistent as was the case in *Mattson.* There, the evidence clearly showed that the money extorted came from the licensee's personal accounts and a personal loan, and moreover, that his employee never reimbursed him for the sum. *Id.* at 1022, 1024. Here, however, there is no evidence in the record definitively showing whether the $400, if it did not come from the FBI, would have come from Livas's personal or business assets. Furthermore, because Livas's companies were all Subchapter S Corporations, it is more difficult to distinguish between Livas's personal and corporate funds, since, as Livas testified at trial, any earnings made by the corporations were reported on Livas's personal income taxes, rather than separate corporate tax returns. Although Carter points out that this mingling of funds for tax purposes focuses on earnings, and not expenditures as is considered for the depletion of assets analysis, this

link, given money's fungibility, *see United States v. Spano*, 401 F.3d 837, 841 (7th Cir. 2005) (quoting *Sabri v. United States*, 541 U.S. 600, 606 (2004)), and the lack of other evidence conclusively showing that the $400 came from Livas's personal accounts, was relevant evidence for the jury to consider.

Although the depletion of assets theory's application to these three counts depends upon the jury drawing inferences from the evidence presented by the Government, this is by no means fatal to satisfying this element of the Hobbs Act. This Court has held that when challenging the sufficiency of the evidence for the Hobbs Act's interstate commerce requirement, the jury is entitled to make inferences in the absence of direct evidence presented by the Government. *Re*, 401 F.3d at 835-36. Accordingly, although finding the interstate commerce element satisfied in this case required that the jury draw inferences in the Government's favor, particularly with respect to the Purge of Lien Notice, these were inferences the jury was entitled to make, and thus the evidence was sufficient with respect to this element.

Carter also argues on appeal that there was insufficient evidence to show that the alleged extortion for the property lists or the Purge of Lien Notice occurred under color of right. To satisfy this element, the Government needed to "show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *United States v. Marshall*, 75 F.3d 1097, 1112 (7th Cir. 1996) (quoting *Evans v. United States*, 504 U.S. 255, 268 (1992)). Carter argues that his conduct in providing the property lists and drafting the Purge of Lien Notice did not implicate his duties as Recorder of Deeds and thus cannot be said

to have occurred under color of right. *See* Ind. Code § 36-2-11-1 *et al.* (containing duties and responsibilities of the County Recorder). Specifically, Carter contends that his position as Recorder of Deeds did not provide him with any special access to the property lists, and that with respect to the Purge of Lien Notice, there is no formal prohibition on the Recorder of Deeds drafting a document to be filed with the office, and moreover, that there was no evidence presented that Livas actually believed Carter could affect the lien.

Carter's arguments, however, overlook the fact that "it is immaterial whether the questioned transaction involves a promise by the official to undertake acts unrelated to his duties[,] '[s]o long as the motivation for the payment focuses on the recipient's office.' " *United States v. Rindone*, 631 F.2d 491, 495 (7th Cir. 1980) (quoting *United States v. Braasch*, 505 F.2d 139, 151 (7th Cir. 1974)). Indeed, as Carter himself acknowledges, this Court has held that "[*de*] *jure* ability to perform the promised act need not be present; sufficient is 'a reasonable belief that the state system so operated that the power in fact of the defendant's office included the effective authority' to fulfill the promise." *Id.* (quoting *United States v. Mazzei*, 521 F.2d 639, 643 (3d Cir. 1975)). Moreover, the Hobbs Act's application is not dependent upon the success of the public official in carrying out his promised acts. Instead, the Act is violated when "one attempts to induce a victim engaged in interstate commerce to part with property," and thus, the relevant inquiry here is "whether [Livas] would have reasonably believed, *at the time of the extortionate act*, that [Carter] could deliver the power of his office for the victim's benefit." *United States v. Nedza*, 880 F.2d 896, 902 (7th Cir. 1989) (emphasis in original) (internal citations and quotations omitted).

Accordingly, it is irrelevant whether providing the property lists or the Purge of Lien Notice did in fact fall under the Recorder of Deeds's duties and responsibilities, or whether Carter did in fact deliver what he promised. Instead, the question is whether sufficient evidence was presented for the jury to conclude that Livas, when he provided Carter with the payments, reasonably believed that Carter could deliver these items based on his position as the Recorder of Deeds. The Government made the requisite showing on this front at trial. With respect to the property lists, when Carter and Livas met on June 11 to exchange the money for the lists, Livas specifically asked Carter how he got the list. Although it was understood by Livas that the list did not come from the Recorder's Office, Carter's response was that the woman in possession of the list was "a personal friend of mine." While this alone would not necessarily be enough to establish that it was Carter's position as the Recorder of Deeds that granted him access to the list, Carter then went on to state that he treated her and others in the Lake County offices "nice" because Carter "always kick[s] these people out . . . what they ask for." A reasonable jury could infer that this latter comment caused Livas to reasonably believe that Carter's access to the list stemmed from favors he performed for others in his capacity as the Recorder of Deeds. Indeed, that this was the thrust of Carter's comment was confirmed by Agent Bookwalter's testimony, when he testified that Carter had told him that his access to the lists began after he had resolved an inter-office issue by arranging for the Auditor's Office to not have to pay Recorder Office fees.

There was also sufficient evidence for the jury to conclude that Livas reasonably believed when he paid $400

to Carter, that Carter could purge the lien on his property due to his position as the Recorder of Deeds. Livas's original contact with Carter stemmed from Miranda's assurance that Carter could help Livas with this issue. Additionally, on July 28, when Carter paid Livas the $400, their conversation reflected that Carter had others do research (at trial it was discovered this was the in-house counsel for the Recorder's Office) on what was needed to purge the lien. That Livas could reasonably believe Carter was providing this Purge of Lien Notice through the power of his office as Recorder of Deeds was only strengthened by the fact that Carter instructed Livas to come to his office to finalize the lien issue, and that once there, Carter arranged for the $17 filing fee to be waived. Regardless of whether the Purge of Lien Notice actually purged the lien, or whether the Recorder of Deeds was in fact prohibited from drafting the document, the jury could reasonably have concluded that Livas reasonably believed that the Purge of Lien Notice was provided due to Carter's position as Recorder of Deeds.

### B.  Questioning Witness Credibility

The second issue appealed by Carter concerns the Government's line of questioning during his cross-examination, where he was asked whether each of the witnesses called by the Government was lying. The parties dispute the proper standard of review to be applied, with Carter claiming that this Court should review the district court's decision to allow this line of questioning for an abuse of discretion, while the Government claims Defense counsel failed to issue a timely objection, thus subjecting the matter to plain error review. *United States v. Thomas*, 453 F.3d 838, 844-45 (7th

Cir. 2006). It is unnecessary, however, for this Court to determine whether the objection raised towards the end of this line of questioning was timely, because even under an abuse of discretion standard, any error committed was harmless. *See United States v. Owens*, 424 F.3d 649, 653 (7th Cir. 2005) (harmless error analysis applies to review for an abuse of discretion); *United States v. Mansoori*, 480 F.3d 514, 523 (7th Cir. 2006) ("The key distinction between the harmless error and plain error analyses lies in the assignment of the burden of persuasion—in plain error cases, it is the defendant's burden to prove that the error *was* prejudicial, whereas in harmless error cases it is the government's burden to prove that the error *was not* prejudicial.") (emphasis in original). For the same reason, it is unnecessary for this Court to determine whether, as the Government argues, Carter's earlier responses to questions "invited" this error, *see United States v. Johnson*, 26 F.3d 669, 777 (7th Cir. 1994) ("A party may not 'invite' error and then argue on appeal that the error for which he was responsible entitles him to relief."); *but see United States v. Napue*, 834 F.2d 1311, 1324 (7th Cir. 1987) ("if defense counsel exceeds proper bounds in eliciting evidence, the prosecutor can object and can even ask that defense counsel be held in contempt; the prosecutor may not, however, fight fire with fire"), thus excusing the Government from the general proposition that "it is improper to ask one witness to comment on the veracity of the testimony of another witness." *Thomas*, 453 F.3d at 846 (quoting *United States v. McKee*, 389 F.3d 697, 699 (7th Cir. 2004)).

This Court will only find that an error was not harmless "if the error had a substantial influence over the jury, and the result reached was inconsistent with substantial

justice." *Owens,* 424 F.3d at 653 (quoting *United States v. Hernandez,* 330 F.3d 964, 969 (7th Cir. 2003)). We note at the outset that this Court, in reviewing similar improper questioning on the credibility of other witnesses for plain error, has placed considerable weight on "the curative effect of jury instructions." *See McKee,* 389 F.3d at 699; *Thomas,* 453 F.3d at 846. Here, the district court instructed the jury that, "You are to decide whether the testimony of each of the witnesses is truthful and accurate in part, in whole, or not at all, as well as what weight, if any, you give to the testimony of each witness," thus mitigating any potential prejudice to Carter stemming from the Government's line of questioning.

Furthermore, by Carter's own admission, many of the other factors relied upon by this Court in making a harmless error determination cut in the Government's favor. This Court has stated that in evaluating whether an error was harmless, it looks to the following factors: "(1) the importance of the witnesses's testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) whether other evidence corroborated or contradicted the witness's material testimony; and (4) the overall strength of the prosecution's case." *United States v. Ochoa,* 229 F.3d 631, 640 (7th Cir. 2000). Carter, however, apparently misconstruing in whose favor these factors are to be read, argues with respect to the first factor that Carter's statements as to the other witnesses' credibility were not important for the Government's case, and similarly for the second factor, argues that the testimony was cumulative given the other testimony provided by the Government's own witnesses. While Carter apparently believed that these factors cut in his favor, a review of this Court's discussion of these factors

in *Ochoa* makes clear that the less important the evidence was to the Government, and the greater the degree to which the evidence was cumulative in nature, the stronger the argument that the error was harmless. *Id.*; *see also United States v. Hernandez-Rivas*, 348 F.3d 595, 600 (7th Cir. 2003). Given these concessions, particularly when coupled with the district court's curative instructions and the amount of video evidence against Carter, we find that the jury would have convicted Carter beyond a reasonable doubt even in the absence of his testimony regarding other witnesses' credibility, and thus the error was harmless.

### C. Sentencing

Carter also appeals his sentence to this Court, claiming that the district court erred by treating the Guidelines as mandatory, particularly in light of the following, as claimed by Carter: 1) facts mitigating in his favor; 2) the weak evidence supporting the enhancement under U.S.S.G. § 3B1.1(c) for serving as a leader; and 3) his history in public service.

With respect to the district court's application of the sentencing enhancement for Carter's serving as a leader, to the extent Carter challenges the enhancement's applicability, the district court's finding was not clearly erroneous. *See United States v. Emerson*, 501 F.3d 804, 815 (7th Cir. 2007) (stating that this Court reviews district court applications of sentencing enhancements and downward adjustments for clear error). The two-point enhancement under U.S.S.G. § 3B1.1(c) applies to defendants who were "an organizer, leader, manager, or supervisor in any criminal activity" of less than five participants. At

the sentencing hearing, the district court heard extensive arguments from both sides regarding the enhancement's applicability. In the end, the district court made a finding that it was Carter who arranged for Livas to meet with Allison, and that in exchange for providing Livas with the contractor's license, Carter accepted the full payment of $500, later doling out $100 of that sum to Allison for having changed Livas's test score. Based upon this arrangement, the district court found that Carter was Allison's leader in this crime. *See* U.S.S.G. § 3B1.1(c) cmt. n.4 (one factor to consider in determining whether the defendant was a leader is the defendant's "claimed right to a larger share of the fruits of the crime"). While Carter offered a differing interpretation of the facts at the sentencing hearing, the district court's findings were supported by the evidence and the application of the sentencing enhancement cannot be said to have been clearly erroneous.

Still, Carter's argument that the district court erred in treating the Guidelines as mandatory does have merit. In reviewing sentences, this Court first addresses whether the district court committed a procedural error, such as "treating the Guidelines as mandatory," before then considering "the substantive reasonableness of the sentence under an abuse of discretion standard." *United States v. Gordon*, 513 F.3d 659, 666 (7th Cir. 2008) (citing *Gall v. United States*, 128 S. Ct. 586, 597 (2007)). This threshold procedural issue, concerning whether the district court failed to properly recognize the advisory nature of the Guidelines, is reviewed *de novo*. *United States v. Schmitt,* 495 F.3d 860, 864 (7th Cir. 2007).

At the sentencing hearing, Defense counsel requested that the district court consider Carter's lengthy career in

public service as a reason for reducing Carter's sentence. The district court inquired as to whether public service had ever been provided as a valid reason for "departure" from the Guidelines in the past, to which Defense counsel answered no. As this Court has held, the use of the term "departure" is not in and of itself problematic, but there is error in using this term when it makes a "substantive difference" on the proper role of the Guidelines, as was the case here. *United States v. Dale*, 498 F.3d 604, 611 n.6 (7th Cir. 2007); *United States v. Rosby*, 454 F.3d 670, 676-77 (7th Cir. 2006). Here, the district court stated:

> I attended a conference last year with regards to the Guidelines. And I was put on notice by the Congress, and by their staff members. As you know there has been a controversy where there was a Supreme Court case that talks about the Guidelines only being advisory. And we were put on notice by Congress that if we departed from them on a regular basis for no valid reason—I say valid, because I was looking to see if there is authority for doing that—that what Congress was going to do is come back and have mandatory minimums and everything. . . . So I don't have a problem with the departure, but I have to find some authority, some basis for it before I'm going to do it. Otherwise, I'm going to have some reluctance to go through with it.

Later, when the district court was providing the basis for its sentence, it reiterated that, "I, too, looked for public officials doing their jobs for a basis of departure, and was not able to find anything that gave me a basis by itself to come down."

   The district court in this case appeared to place too much weight on the Guidelines. The Guidelines are but

one factor among those listed in 18 U.S.C. § 3553(a), and regardless of whether courts have previously recognized public service as a ground for departure from the Guidelines, sentencing courts are charged with considering as part of the § 3553(a) factors "the history and characteristics of the defendant," which would include a defendant's public service. § 3553(a)(1); *see Rita v. United States*, 127 S. Ct. 2456, 2473 (2007) (Stevens, J., concurring) ("Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines. These are, however, matters that § 3553(a) authorizes the sentencing judge to consider.") (internal citations omitted). This factor, of course, must be balanced with the other § 3553(a) considerations, including the need to avoid unwarranted sentencing disparities under § 3553(a)(6). We offer no opinion at this time as to how these § 3553(a) factors should be measured in this case, but remand for resentencing so the district court can make this determination with the Guidelines being given their appropriate post-*Booker* weight. *See United States v. Shannon*, 518 F.3d 494, 496 (7th Cir. 2008) ("A sentence is reasonable if the district court gives meaningful consideration to the factors enumerated in 18 U.S.C. § 3553(a), including the advisory sentencing guidelines, and arrives at a sentence that is objectively reasonable in light of the statutory factors and the individual circumstances of the case.").

### III. Conclusion

For the foregoing reasons, we AFFIRM Defendant's convictions on all counts, but VACATE Defendant's sentence and REMAND for resentencing.